1      **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2      Name    Costella         David              Louis
                (Last)          (First)           (Initial)

3      Prisoner Number ___T-86218___

4      Institutional Address ___E2-244 CSATF, P.O. Box 5242, Corcoran, CA 93212___

5

6      ====================================================================

       **UNITED STATES DISTRICT COURT**
7      **NORTHERN DISTRICT OF CALIFORNIA**

8      David Louis Costella                    CV  08          1010
       (Enter the full name of plaintiff in this action.)

9                        vs.                   Case No. _____
                                               (To be provided by the clerk of court)
10     Kenneth Clark, Warden        and

11     California Director of Corrections and Rehabilitation    **PETITION FOR A WRIT**
                                                                **OF HABEAS CORPUS**
12     _____

13     _____         E-filing

14     (Enter the full name of respondent(s) or jailor in this action)

15

16     ====================================================================

       Read Comments Carefully Before Filling In

17     When and Where to File

18          You should file in the Northern District if you were convicted and sentenced in one of these

19     counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20     San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21     this district if you are challenging the manner in which your sentence is being executed, such as loss of

22     good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23          If you are challenging your conviction or sentence and you were not convicted and sentenced in

24     one of the above-named fifteen counties, your petition will likely be transferred to the United States

25     District Court for the district in which the state court that convicted and sentenced you is located.  If

26     you are challenging the execution of your sentence and you are not in prison in one of these counties,

27     your petition will likely be transferred to the district court for the district that includes the institution

28     where you are confined.  Habeas L.R. 2254-3(b).

       PET. FOR WRIT OF HAB. CORPUS            - 1 -

1 | Who to Name as Respondent

2 |     You must name the person in whose actual custody you are. This usually means the Warden or

3 | jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4 | you are imprisoned or by whom you were convicted and sentenced. These are not proper

5 | respondents.

6 |     If you are not presently in custody pursuant to the state judgment against which you seek relief

7 | but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8 | custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9 | was entered.

10 | A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11 |     1. What sentence are you challenging in this petition?

12 |     (a)   Name and location of court that imposed sentence (for example; Alameda

13 |     County Superior Court, Oakland):

14 |     Santa Clara County Superior Court     San Jose, CA

15 |     Court             Location

16 |     (b)   Case number, if known _____ H025751(Appeal); H030614 &H027157 (Habeas)

17 |     (c)   Date and terms of sentence _____ March 14, 2003;  18 years

18 |     (d)   Are you now in custody serving this term? (Custody means being in jail, on

19 |     parole or probation, etc.)    Yes ✓    No _____

20 |     Where?

21 |     Name of Institution: _____ California State Prison at Corcoran

22 |     Address: _____ P.O. Box 8800, Corcoran, CA 93212-8309

23 |     2. For what crime were you given this sentence? (If your petition challenges a sentence for

24 | more than one crime, list each crime separately using Penal Code numbers if known. If you are

25 | challenging more than one sentence, you should file a different petition for each sentence.)

26 | 1) Penal Code Section 288.5 - Resident Child Molestation

27 | 2) Penal Code Section 288(a)- Lewd and Lasivious Acts with Child under 14

28 |

PET. FOR WRIT OF HAB. CORPUS    - 2 -

1    3. Did you have any of the following?

2        Arraignment:                          Yes ✓____    No ____

3        Preliminary Hearing:                  Yes ✓____    No ____

4        Motion to Suppress:                   Yes ____     No ✓____

5    4. How did you plead?

6        Guilty ____    Not Guilty ✓____    Nolo Contendere ____

7        Any other plea (specify) _____

8    5. If you went to trial, what kind of trial did you have?

9        Jury ✓____    Judge alone ____    Judge alone on a transcript ____

10   6. Did you testify at your trial?           Yes ✓____    No ____

11   7. Did you have an attorney at the following proceedings:

12       (a)   Arraignment                     Yes ✓____    No ____

13       (b)   Preliminary hearing             Yes ✓____    No ____

14       (c)   Time of plea                    Yes ✓____    No ____

15       (d)   Trial                           Yes ✓____    No ____

16       (e)   Sentencing                      Yes ✓____    No ____

17       (f)   Appeal                          Yes ✓____    No ____

18       (g)   Other post-conviction proceeding  Yes ✓____    No ____

19   8. Did you appeal your conviction?         Yes ✓____    No ____

20       (a)   If you did, to what court(s) did you appeal?

21             Court of Appeal                 Yes ✓____    No ____

22             Year: 2004        Result: Affirmed _____

23             Supreme Court of California     Yes ✓____    No ____

24             Year: 2004        Result: Petition for Review Denied ____

25             Any other court                 Yes ____     No ✓____

26             Year: _____    Result: _____

27

28       (b)   If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS        - 3 -

1    petition?                                    Yes ____    No ✓

2    (c)    Was there an opinion?                 Yes ✓    No____

3    (d)    Did you seek permission to file a late appeal under Rule 31(a)?

4                                                 Yes ____    No ✓

5           If you did, give the name of the court and the result:

6    _____

7    _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?        Yes ✓    No____

10    [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11    challenged the same conviction you are challenging now and if that petition was denied or dismissed

12    with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13    for an order authorizing the district court to consider this petition. You may not file a second or

14    subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15    U.S.C. §§ 2244(b).]

16    (a)    If you sought relief in any proceeding other than an appeal, answer the following

17           questions for each proceeding. Attach extra paper if you need more space.

18           I.    Name of Court: _California Court of Appeal_____

19                 Type of Proceeding: _Petition for Writ of Habeas Corpus_____

20                 Grounds raised (Be brief but specific):

21                 a._Ineffective Assistance of Counsel (see attached Memorandum of P&A's)

22                 b._____

23                 c._____

24                 d._____

25                 Result: _Denied foll. Evidentiary Hearing___ Date of Result:_2007____

26           II.   Name of Court: _California Supreme Court_____

27                 Type of Proceeding: _Petition for Review_____

28                 Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        - 4 -

1    a. Ineffective Assistance of Counsel (see attached Memoradum of P&A's)

2    b._____

3    c._____

4    d._____

5    Result: Petition Denied _____ Date of Result: 2/7/07

6    III.    Name of Court: _____

7    Type of Proceeding: _____

8    Grounds raised (Be brief but specific):

9    a._____

10    b._____

11    c._____

12    d._____

13    Result: _____ Date of Result: _____

14    IV.    Name of Court: _____

15    Type of Proceeding: _____

16    Grounds raised (Be brief but specific):

17    a._____

18    b._____

19    c._____

20    d._____

21    Result: _____ Date of Result: _____

22    (b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

23    Yes _____    No ✓

24    Name and location of court: _____

25    **B. GROUNDS FOR RELIEF**

26    State briefly every reason that you believe you are being confined unlawfully. Give facts to

27    support each claim. For example, what legal right or privilege were you denied? What happened?

28    Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS    - 5 -

1  need more space.  Answer the same questions for each claim.

2  [Note: You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One:_Trial counsel was ineffective for not investigating all of petitioner's available

6  defenses (see subparts contained in accompanying memorandum)(Strickland v. Washington)

7  Supporting Facts:____(see detailed statement of facts contained in accompanying memorandum)

8

9

10

11  Claim Two:__Penal Code section 288.5 conviction based on accusatory pleading filed after

12  expiration of Statute of Limitations (Stogner v. California (2003) 539 U.S. 607)

13  Supporting Facts:_____

14

15

16

17  Claim Three:_____

18

19  Supporting Facts:_____

20

21

22

23  If any of these grounds was not previously presented to any other court, state briefly which

24  grounds were not presented and why:

25  Grounds presented in either direct appeal or habeas petitions

26  _____

27  _____

28  _____

PET. FOR WRIT OF HAB. CORPUS          - 6 -

1    List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case. Do not discuss the holding or reasoning

3    of these cases:

4    (see acccompanying memorandum of law)

5

6

7    Do you have an attorney for this petition?                    Yes ✓        No____

8    If you do, give the name and address of your attorney:

9    Peter F. Goldscheider  438 Cambridge Ave. Ste. 250 Palo Alto, CA 94306

10    WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11    this proceeding. I verify under penalty of perjury that the foregoing is true and correct.

12

13    Executed on __12-31-07__

14         Date                                    Signature of Petitioner

15

16

17

18

19

20    (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

```
Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611015987
Cashier ID: almaceh
Transaction Date: 02/20/2008
Payer Name: DAVID L COSTELLA
------------------------------------
WRIT OF HABEAS CORPUS
 For: DAVID L COSTELLA
 Amount:      $5.00
------------------------------------
CASH
 Amt Tendered:  $5.00
------------------------------------
Total Due:      $5.00
Total Tendered: $5.00
Change Amt:     $0.00

C08-1010 PJH (PR)


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it  was drawn.
```

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID LOUIS COSTELLA,** | ) |
| | ) |
| **Plaintiff,** | ) **No.** |
| | ) |
| **-vs-** | ) |
| | ) |
| **KENNETH CLARK, Warden, and** | ) |
| **CALIFORNIA DEPARTMENT OF** | ) |
| **CORRECTIONS &** | ) |
| **REHABILITATION** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | / |

## MEMORANDUM OF FACTS AND LAW IN SUPPORT OF

## PETITION FOR A WRIT OF HABEAS CORPUS

**David Louis Costella**
**Pro Se**

**C/0 Peter F. Goldscheider**
**Attorney at Law**
**438 Cambridge Avenue, Suite 250**
**Palo Alto, CA 94306**
**(650) 323-8296**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.............................................................................. iv

INTRODUCTION............................................................................................ 1

    A.     History of the State Proceedings.................................................. 2

    B.     Issues Presented for Review....................................................... 6

STATEMENT OF THE FACTS....................................................................... 6

    A.     Trial Testimony........................................................................... 6

            Prosecution Case........................................................................ 6

            Defense Case.............................................................................. 13

    B.     Summary of the Factual Allegations Contained in the
            Declaration in the Original Petition for Writ of
            Habeas Corpus, the Return and the Traverse to the
            Return....................................................................................... 15

            The Original Petition.................................................................. 15

            The Return.................................................................................. 18

            The Traverse.............................................................................. 19

    C.     Evidence Adduced at the Evidentiary Hearing........................... 20

            Testimony of Petitioner, Attorney Jachimowicz and
            Sherri Costella........................................................................... 20

            Testimony of Nadia Chapman..................................................... 32

            Testimony of Phil Costella, Gene Wilson and Terry
            Green.......................................................................................... 33

Testimony of Sean Costella and Investigator Morland.............. 34

Testimony of Dr. Allen Garton and Brian Abbott..................... 36

Other Evidence......................................................................... 37

ARGUMENT............................................................................... 38

I.  TRIAL COUNSEL PROVIDED INEFFECTIVE
    ASSISTANCE AT TRIAL BY FAILING TO
    INVESTIGATE MAGGIE'S CREDIBILITY, BY
    FAILING TO INVESTIGATE EVIDENCE THAT COULD
    HAVE BEEN ADDUCED FROM PETITIONER'S EX-
    GIRLFRIENDS AND BY THE FAILURE TO CONSIDER
    USING EXPERT TESTIMONY ON THE ISSUES OF
    WHETHER PETITIONER HAD THE PROPENSITY
    TO COMMIT THE CHARGED OFFENSES AND
    WHETHER MAGGIE COULD HAVE IMAGINED THE
    MOLESTATIONS...................................................................... 38

    A.  Standard of Review........................................................... 38

    B.  Analysis........................................................................... 40

        1.  Trial Counsel was Ineffective When he
            Failed to Conduct a Thorough Investigation
            of Maggie's Credibility Including Her
            Statements as to Where and When the
            Molest Occurred.................................................... 40

        2.  Counsel was Ineffective When he Failed to
            Contact and Interview Petitioner's Ex-
            Girlfriends on the Issue of Whether, in
            Their Opinion, Petitioner was Unlikely to
            Have Committed the Charged Offenses.............. 52

3.  Trial Counsel Failed in his Duties When he
    Failed to Pursue the Possibility that Petitioner
    Did Not Have the Personality Characteristics
    of a Child Molester and When he Failed to
    Consult an Expert on his Theory that Maggie
    Had Imagined the Molest......................................     56

    A.  The Failure to Call an Expert on the
        Subject of Petitioner's Personality...........     56

    B.  The Failure to Introduce Expert
        Testimony that Maggie Could Have
        Imagined the Molest..................................     58

4.  Taken in its Totality, the Cumulative Effect
    of Trial Counsel's Omissions Resulted in
    Petitioner Being Deprived of a Fair Trial,
    The Outcome of Which is Presumptively
    Unreliable.............................................................     60

II.  PETITIONER'S CONVICTION FOR THE VIOLATION
     OF PENAL CODE SECTION 288.5 WAS UNLAWFUL
     IN THAT THE ACCUSATORY PLEADING WAS
     FILED AFTER THE EXPIRATION OF THE STATUTE
     OF LIMITATIONS AND ITS REVIVAL WAS BARRED
     BY *STOGNER V. CALIFORNIA*................................     66

CONCLUSION.............................................................................     68

# **TABLE OF AUTHORITIES**

**Page**

*Anderson v. Johnson* (5th Cir. 2003) 338 F. 3rd 382, 391........................... 48
*Blackburn v. Foltz* (6th Cir. 1987)................................................. 48
*Bryant v. Scott* (5th Cir. 1994) 28 F. 3rd 1411.......................................... 48, 55
*Chacon v. Wood* (9th Cir. 1994) 336 F. 3rd 1459, 1465.............................. 40
*Dixon v. Synder* (7th Cir. 2001) 266 F. 3rd 693, 703................................. 53
*Foster v. Lockhart* (8th Cir. 1993) 9 F. 3rd 722, 726................................. 51
*Franklin v. Henry* (9th Cir. 1997) 122 F. 3rd 1270, 1273........................... 49, 52, 59
*Harris ex. rel. Ramseyer v. Wood* (9th Cir. 1995) 64 F. 3rd 1432,
     1437........................................................................................ 55
*Hart v. Gomez* (9th Cir. 1999) 174 F. 3rd 1067......................................... 49
*House v. Bell* (2006) 547 U.S. 518, 126 S.Ct. 2064................................... 63, 64
*In re Love* (1974) 11 Cal. 3rd 179, 193.................................................. 20
*Kimmelman v. Morrison* (1986) 477 U.S. 365, 384.................................... 48
*Kyles v. Whitley* (1995) 514 U.S. 419, 436.............................................. 63
*Lewis v. Johnson* (3rd Cir. 2004) 359 F. 3rd 646, 659................................ 48
*Lockyer v. Andrade* (2003) 538 U.S. 63, 71............................................. 38
*Luna v. Cambra* (9th Cir. 2002) 306 F. 3rd 954, 960................................ 40
*Lord v. Wood* (9th Cir. 1999) 184 F. 3rd 1083, 1096................................. 49
*Michelson v. United States* (1948) 335 U.S. 469, 476 [93 L.Ed. 168,
     174, 69 S.Ct. 213]........................................................................ 52
*People v. McAlpin* (1991) 53 Cal. 3rd 1289, 1309..................................... 52
*People v. Stoll* (1989) 43 Cal. 3rd 1138, 1154.......................................... 56
*Pirtle v. Morgan* (9th Cir. 2002) 313 F. 3rd 1162, 1167.............................. 40
*Profit v. Wainwright* (11th Cir. 1982) 685 F. 2nd 1127, 1247...................... 49
*Raygoza v. Hulick* (7th Cir. 2007) 474 F. 3rd 958, 965.............................. 52
*Riley v. Payne* (9th Cir. 2003) 352 F. 3rd 1313......................................... 48
*Rompilla v. Beard* 125 S. Ct., 2456, 2466 (U.S. 2005).............................. 46, 47
*Rose v. Superior Court* (2000) 81 Cal. App. 4th 564, 574.......................... 20
*Sanders v. Ratelle* (9th Cir. 1994) 21 F. 3rd 1446.................................... 50
*Shackleford v. Hubbard* (9th Cir. 2000) 234 F. 3rd 1072, cert.
     denied 534 U.S. 944 (2001)........................................................... 39
*Smith v. Dretke* (5th Cir. 2005) 417 F. 3rd 438, 442................................. 53
*Smith v. Wainwright* (11 Cir. 1984) 741 F. 2nd 1248, cert. den.
     470 U.S. 1087 (1985)
*Soffar v. Dretke* (5th Cir. 2004) 368 F. 3rd 441, 476-477........................... 50, 59

**Page**

*Steinkuehler v. Meschner* (8th Cir. 1999) 176 F. 3rd 441............................. 49
*Stogner v. California* (2003) 539 U.S. 607................................................ 2, 3, 6, 66, 67
*Strickland v. Washington* (1984) 466 U.S. 668............................................ 2, 6, 48, 57, 64
*Taylor v. Maddox* (9th Cir. 2004) 366 F. 3rd 992, 1000............................... 40, 54
*Thompson v. Keohane* (1995) 516 U.S. 99, 109-113................................... 40
*United States v. Cronic* (1984) 466 U.S. 648............................................. 2, 64
*United States v. Gray* (3rd Cir.1989) 878 F. 2nd 701, 712........................... 55
*Wiggins v. Smith* (2003) 539 U.S. 510...................................................... 48
*Williams v. Taylor* (2000) 529 U.S. 362, 412............................................. 38, 39

## Statutes

Penal Code §261.................................................................................. 67
Penal Code §286.................................................................................. 67
Penal Code §288.................................................................................. 67
Penal Code §288(a)............................................................................. 1, 2, 67
Penal Code §288.5............................................................................... 1, 2, 3, 6, 66, 67
Penal Code §289.................................................................................. 67
Penal Code §289.5............................................................................... 67
Penal Code §800.................................................................................. 3, 66
Penal Code §801.................................................................................. 3
Penal Code §803(f).............................................................................. 3
Penal Code §803(g)............................................................................. 66
28 U.S.C. §2254.................................................................................. 1
28 U.S.C. §2254(d).............................................................................. 6, 38, 57
28 U.S.C. §2254(d)(2).......................................................................... 39
28 U.S.C. §2254(e)(1).......................................................................... 39

## Other Authorities

1 ABA Standards for Criminal Justice 4-4.1 (2nd ed. 1982 Supp.) fn 6...... 47
Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA)......... 38
California Rule of Court 4.551 subd. (d)..................................................... 20
U.S. Constitution, *Ex Post Facto Clause*.................................................... 66, 67
1993 Cal. Stats. Ch. 390, §1.................................................................... 66

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DAVID LOUIS COSTELLA,** | ) |
| | ) |
| **Plaintiff,** | ) **No.** |
| | ) |
| **-vs-** | ) **MEMORANDUM OF** |
| | ) **FACTS AND LAW IN SUPPORT OF** |
| **KENNETH CLARK, Warden, and** | ) **PETITION FOR A WRIT OF HABEAS** |
| **CALIFORNIA DEPARTMENT OF** | ) **CORPUS** |
| **CORRECTIONS &** | ) |
| **REHABILITATION** | ) |
| | ) |
| **Defendant.** | ) |
| | / |

## INTRODUCTION

This is a Petition for a Writ of Habeas Corpus filed by Petitioner DAVID LOUIS

COSTELLA, a state prisoner, filed pursuant to 28 U.S.C. §2254. Petitioner was convicted

by a jury in the Santa Clara County Superior Court of two counts of sexually molesting his

own daughter, Maggie. (See California State Penal Code sections 288.5, 288(a))

Following his conviction by jury, Petitioner was sentenced to a term of eighteen years in

the California Department of Corrections, receiving twelve years for Count One and a

consecutive full term of six years for Count Two.

-1-

As recited in detail below, Petitioner seeks relief by means of this Petition on the grounds that first, his trial attorney was ineffective in that he completely failed to investigate the facts underlying Maggie's uncorroborated allegations, as specified in detail below with the result that the conviction that occurred was "presumptively unreliable" within the meaning of *United States v. Cronic* (1984) 466 U.S. 648 and *Strickland v. Washington* (1984) 466 U.S. 668; and, second, with regard to his conviction for Penal Code section 288.5, that that Count was filed following the expiration of the statute of limitations and based on a "revival" statute in violation of Petitioner's ex post facto rights and the pronouncement of the United State Supreme Court in *Stogner v. California* (2003) 539 U.S. 607.

The allegations of ineffective assistance of counsel were raised via a Petition for Writ of Habeas Corpus filed contemporaneously with Petitioner's direct appeal (see details below) and the alleged violation of Petitioner's ex post facto rights was raised in Petitioner's direct appeal.

## A. **History of the State Proceedings**

Petitioner was charged and convicted as a result of a felony Complaint initially filed on April 29, 2002, and amended on July 12, 2002. The Amended Complaint alleged two counts, first, a violation of section 288.5, alleging the crimes were committed between May 1, 1992 and December 31, 1994, along with a second count alleging a violation of Penal Code section 288(a), lewd acts with a child, specifying that the offense took place between

-2-

January 1, 1995, and December 31, 1995. The Amended Complaint also alleged that the
288.5 count was not time barred in that it was based on California Penal Code section
803(f), which provides for such prosecution when "at least one violation . . . (occurred)
within the limitations period specified for that crime in Penal Code sections 800 and 801."
It is alleged herein that the manner in which section 803 (f) was applied here acted as a
"revival" statute condemned by the United Supreme Court in *Stogner*, which was decided
after Petitioner was charged and convicted in this case.

Petitioner was convicted in a jury trial on both counts and sentenced as previously
indicated.

Thereafter, the Petitioner filed a direct appeal from his conviction, alleging various
grounds, including the statute of limitations/ex post facto argument contained in this
Habeas Petition. Contemporaneously, he filed a Petition for Writ of Habeas Corpus
alleging ineffective assistance of counsel on the grounds that first, his trial counsel was
ineffective by failing to conduct any investigation of the credibility of the complaining
witness, despite having been provided ample grounds to do so by Petitioner; second, that
defense counsel failed to impeach Maggie on various matters to which she testified at trial;
third, that he failed to elicit both expert testimony and lay testimony that Petitioner did not
have the personality characteristics of a child molester; fourth, that trial counsel failed to
attempt to exclude irrelevant and prejudicial evidence; fifth, that defense counsel failed to
exclude inadmissible hearsay statements that Maggie made regarding her alleged

-3-

molestation; and, finally that trial counsel was ineffective for failing to move to exclude

statements by Petitioner to police that he was willing to take a polygraph examination, or,

in the alternative, seek to have admitted the fact that Petitioner had in fact taken a

polygraph examination and found to be truthful in his denials.

On October 1, 2004, the California State Court of Appeal denied Petitioner's direct

appeal in a written opinion and on that same date, denied without comment his

accompanying Petition for Writ of Habeas Corpus. On January 12, 2005, however, the

California State Supreme Court directed the Court of Appeal to issue an Order to Show

Cause returnable before the Santa Clara County Superior Court, as to why Petitioner was

not entitled to relief based on the ineffective assistance of his trial counsel "for failing to

conduct an investigation into the credibility of witness M, and for failing to investigate and

present lay and expert testimony establishing that Petitioner did not exhibit sexually

deviant personality characteristics . . .." (Order of California State Supreme Court dated

July 12, 2005) It is upon these issues, regarding which the California Supreme Court

issued its Order to Show Cause, that Petitioner raises his allegations that he received

ineffective assistance of counsel in the State Court trial proceedings.

On January 14, 2005, the Court of Appeal remanded the matter to the Superior

Court of the County of Santa Clara for further proceedings and for an Evidentiary Hearing,

if necessary.

-4-

After the filing of a Return and traverse in the Superior Court, on December 19th, 20th, and 23rd, the Honorable Linda R. Condron conducted an Evidentiary Hearing into the allegations of the Petition for Writ of Habeas Corpus, as ordered by the California State Supreme Court and the California State Court of Appeal. Following the taking of testimony and written argument, on April 26, 2006, that court issued its "final order" denying the Petition for Writ of Habeas Corpus. (Attached as Exhibit A)

On September 11, 2006, Petitioner filed his Petition for Writ of Habeas Corpus Following the Evidentiary Hearing in the Court of Appeal. The Court of Appeal denied that Petition on December 11, 2006. On December 20, 2006, Petitioner filed a Petition for Review with the California State Supreme Court, which requested an Answer from the State of California. On February 14, 2007, the California State Supreme Court denied the Petition for Writ of Habeas Corpus Following Evidentiary Hearing without a written decision.

It is from that final Order of the California State Supreme Court that Petitioner brings this Petition for Writ of Habeas Corpus seeking relief from the violation of his constitutional rights under the United States Constitution. Because the opinion of the Superior Court is the only written decision pertaining to the allegation that he was deprived of his right to effective representation, it is that opinion which this court will need to consider with regard to that allegation. As will be demonstrated below, the decision of the

-5-

State Court was both an unreasonable determination of the facts as well as an unreasonable

application of *Strickland* as required by 28 U.S.C. §2254(d).

**B.    Issues Presented For Review**

1.      Did Petitioner receive ineffective assistance of counsel by trial counsel

completely failing to investigate the credibility of the complaining witness, by not

contacting or interviewing any witnesses (including Petitioner's ex-girl friends) on the

issue of whether of not, in their opinion, Petitioner could have committed the charged

offenses, and, finally, when he failed to utilize expert testimony on either his alleged theory

that Maggie had imagined the molests or that Petitioner did not have the personality

characteristics of a child molester?

2.      Was Petitioner's conviction for the violation of Penal Code section 288.5

barred by the application of a revival statute as condemned by the United State Supreme

Court in *Stogner v. California?*

## STATEMENT OF THE FACTS

**A.    Trial Testimony**

**Prosecution Case**

Maggie is the daughter of Appellant and Patricia Ann Costella, who divorced when

Maggie was approximately five years of age. Maggie's date of birth is November 29,

1984. (Reporter's transcript pages 217-18, 561, hereinafter RT 217-18, 561) According to

the testimony of Maggie's friend, Monica Saadi, several months after they had met in

-6-

September 1998, Maggie disclosed to Monica that she had been "molested" by her father

years earlier. (RT 138-140)  Monica did not remember the exact words that Maggie used

and she did not discuss the subject with her again until early 2002, when Maggie indicated

to Monica that she was about to tell her mother.  (RT 143, 153)  To Monica's knowledge,

Maggie had told no one else about her father molesting her prior to her disclosing it to her

mother, other than her boyfriend, Ali Nazari, whom Maggie had started to see in the Fall of

1998.

According to Nazari, the two started going out when he was sixteen and she was

fourteen.  Approximately six months after they had met, Maggie disclosed to Nazari as

well that her father had "physically abused me."  (RT 274)  She did not give further details.

(RT 275)  Maggie had disclosed this information at a time when the two had just begun to

have sexual intercourse. (RT 276-277)  Although Nazari stated that he encouraged Maggie

to report the abuse to an adult, he told no one until he was contacted by Detective Grothaus

of the San Jose Police Department, following Maggie's disclosing these events to her

mother in March 2002. (RT 279)

According to Patricia Costella, following their divorce, Appellant lived in a series of

rentals, including one on Willowdale Avenue in San Jose in 1992 and 1993. (RT 353-353)

As a result of their divorce, a visitation schedule had been formulated in which Maggie and

her brother would be with Appellant every Tuesday and Thursday during the day and

would also spend every other weekend between Friday through Sunday with him, including

-7-

sleeping at his residence. (RT 368-369) Beginning in August, 1998, Maggie stopped going over to her father's residence on a regular basis. (RT 353) According to her mother, she was "tired of his drinking and they had gotten into an argument." (RT 374) Ms. Costella also indicated, however, that she had received a call from Appellant's then wife, Gerri Ferrari, who had informed her that it was Appellant who had decided that he no longer wanted Maggie to stay at the house. (RT 390) Maggie at no time suggested that it was due to her being molested and made no such claim until March 4, 2002. (RT 358-359) Although not explained by Ms. Costella, these disclosures followed an incident in which Maggie became angry with Appellant for not committing himself to funding her a four-year college education. (RT 621; see also Ex. 19, Appellant's taped statement to Detective Grothaus; transcript admitted into evidence)

Patricia Costella had had problems with her daughter for a number of years and described Maggie as having a "very erratic" personality. (RT 360)

Several days before March 4, 2002, Maggie and her mother had had a heated argument, which culminated in Ms. Costella informing Maggie that her behavior was unacceptable and that perhaps she should go live with Appellant. (RT 361-362) It was during that conversation that Maggie told Patricia that Appellant had been having "sex" with her. (RT 362) Maggie gave no details and her mother did not ask for any. (RT 363) After her mother said that they needed to call the police, Maggie indicated that she did not want the police involved. (RT 365)

-8-

During 2001 and 2002, Maggie had been prescribed the drugs Paxil and Prozac as the result of her counseling sessions. (RT 387)

Following Maggie's disclosure, Patricia contacted the San Jose Police Department and was put in contact with Detective Grothaus, who was the primary investigator on the case. Grothaus suggested a pretext call in which Maggie would attempt to elicit admissions from her father about the molest. Patricia told Grothaus that Appellant would never make such admissions. (RT 393) In fact, when both Maggie and Patricia separately called Appellant and accused him of molesting Maggie, Appellant denied doing any such thing. (RT 395) The tape recordings of these conversations were admitted into evidence along with transcripts of the calls. (RT 396-399; Ex. 11-12, 15-16)

According to Maggie's trial testimony, she first recalled Appellant having sexual intercourse with her while she was in third grade (1992 , age 7[1]). The sexual activity occurred on most, but not all, of her weekend visits with her father and all the molestations occurred at the Willowdale address. (RT 170-171, 174, 203-204) She specifically recalled a particular comforter on the bed that had a design that included lambs and sheep. (TR 171, 222) The molests continued until Geraldine Ferrari, his then girlfriend, moved into the Willowdale residence. (RT 169, 205) Ferrari was uncertain of the time frame, but believed that it was in the summer of 1995. (RT 245)

---

[1]

Extrapolated from Maggie's birth date and other testimony correlating age to grade level (see Appendix attached to Appellant's Opening Brief).

-9-

Maggie stated that while she would be sleeping, Appellant would enter the room after it became dark and awake her. (RT 171-172) He would then have sexual intercourse. The acts would occur after Appellant would pull her underwear down to her ankles. (RT 230) Maggie did not know if Appellant used a condom or if he ever ejaculated. (RT 172) Appellant told her not to tell anyone and that it was "our secret." (RT 173)

At first, Maggie stated that she did not know that there was anything wrong with this behavior, but later, as she became older, she viewed it differently. She stated that she would get "defensive" and "hot headed" and would have "attitude problems." (RT 174-175) She would ask the Appellant to stop but did not feel in "control" of the situation. (RT 178)

Maggie also stated, however, that she realized that the behavior was wrong from the beginning, in that she recalled a police officer coming in to talk to her class in the third grade about being careful of strangers. (RT 168) She became more aware as she was provided with sex education during the sixth through eighth grades. (RT 176-177)

Contrary to the testimony of Monica Saadi, Maggie testified that the first person she told was her boyfriend, Ali Nazari, with whom she was having sexual intercourse. She was in the ninth grade at the time. (RT 180, 219) According to Maggie, it was not until the following year that she told her girlfriend, Monica. (RT 80, 196) She never gave details to Monica about the molest or that it consisted of sexual intercourse. (RT 196)

-10-

In her senior year of high school, when she was seventeen years of age, and after an argument with her mother during which her mother told her that maybe she should live with her father, Maggie informed her that "I can't go live with Dad." When asked why, she finally informed her mother of the molestations. (RT 183)

Maggie also described a letter that her mother had found on the computer after the report of the molestation had been made to the police. (RT 186, 400 et. seq.) In the letter, she had made references to having been "innocent" and the fact that someone "took advantage of that innocence." The document also stated "here I am in the prime of my life and I have to deal with these problems" and "maybe because you are a sorry excuse for a parent" and " how could you do this? You told me I was your princess. I guess you were wrong." It concluded "I am your princess no longer, Dad. I am your worst enemy." (RT 186-187) Maggie gave no explanation on direct examination as to the document other than it was for a school project.

Maggie indicated that she never told any of her school counselors or anyone else about the sexual abuse prior to informing her mother in March, 2002. (RT 220)

Geraldine Ferrari was Appellant's girlfriend in 1995 when she moved in with Appellant. (RT 245) At that time, Maggie was approximately ten or eleven years old. (RT 247) Ferrari indicated that she was uncomfortable with the relationship between father and daughter and believed that Appellant was unduly affectionate to his daughter, "nuzzling" his nose into her neck. (RT 250) On one occasion, when she walked by Maggie's room,

-11-

she saw Appellant on top of the bed covers right next to Maggie stroking her head. (RT 250) On another occasion, when Maggie was eleven or twelve years old, she noticed Appellant tickling Maggie on her side. Ferrari stated that she found this behavior inappropriate but did not articulate why she felt that way. She told no one about it at the time. (RT 269) Ms. Ferrari also found it inappropriate when Appellant would greet his daughter by kissing her on the lips. (RT 266)

Ferrari described being present on the occasion of the argument between Appellant and Maggie which led to Maggie ceasing to visit every other weekend. There had been an argument and Maggie yelled at Appellant, who had been drinking. Appellant then stated "That's it, period, get out, period, call your mother to come over and get you." According to Ferrari, to her knowledge, it was the last time that Maggie ever came over to the house. (RT 254) The previously received evidence indicated that this event occurred shortly before she informed Monica and Ali of the molests.

Caitlin Sullivan, one of Maggie's high school teachers, testified about an assignment she had given the children. It included their writing an essay in a "mad voice." (RT 412-422, 447) Although the whereabouts of the original were unknown, Ms. Sullivan was asked to identify a computer printout of the journal entry Maggie had previously identified. (RT 450) Ms. Sullivan did not know if this was the same document that had been presented as the school assignment. She acknowledged that she may not have read it

-12-

carefully at the time. (RT 447, 450) Ms. Sullivan stated that at no time had Maggie ever told her that she had been sexually molested. (RT 452)

Both the prosecution and the defense called expert witnesses on the subject of the Child Sexual Abuse Accommodation Syndrome, hereinafter "CSAAS." The prosecution elicited testimony from Carl Lewis, a former police officer and an investigator with the District Attorney's office. (RT 291, 296) Mr. Lewis had only law enforcement training experience on the subject of the syndrome, had no training in psychology and had never conducted a therapy session. (RT 303, 305, 306) Mr. Lewis offered no opinion on whether Maggie had been the subject of a sexual molest.

Brian Abbott, who possesses a Ph.D. in clinical psychology and had trained at the Giaretto Institute in Santa Clara County, which had established the first child sexual abuse treatment program, testified for the defense. (RT 517) Dr. Abbott indicated that the CSAAS theory was inapplicable to those cases as here, where there had not been a retraction of the molest allegations. Dr. Abbott specifically opined that the CSAAS could not be employed to explain a delaying in reporting when there was no later retraction of the initial report. (RT 527-528, 531)

### Defense Case

Appellant testified on his own behalf. Appellant denied molesting his daughter and specifically having sexual intercourse with her at any time, including just prior to Ms. Ferrari moving in with him at the Willowdale address. (RT 564, 573) He also denied

-13-

having a drinking problem and that drinking broke up his marriage with Patricia Costella. (RT 589)  He did not recall having any argument with Ms. Ferrari regarding his behavior with Maggie or that Ms. Ferrari appeared concerned about the manner in which he displayed affection to Maggie.  (RT 571, 617)

Appellant recalled the specific day in October or November 1998, when he decided that Maggie would no longer come over to his house on a regular basis. (RT 601)  It occurred after a fight between himself and Patricia.  In an ensuing argument, Maggie called him a "fucking asshole" and in general, displayed a very bad attitude, according to Appellant. (RT 605-606)  After that day, Maggie would occasionally come over, particularly on holidays, but did stop coming over on a regular basis.  (RT 576, 603, 609)

The pretext call made by Maggie at the request of the police came as a shock to him. He stated that he told Maggie her allegations were untrue and that he would immediately call her mother.  (RT 612)  Appellant stated that he did not call Patricia because he was uncertain as to what to do next.

During the course of the trial, the two pretext calls were played before the jury and transcripts of those conversations were admitted into evidence.

During these pretext calls, Appellant adamantly denied that he had molested Maggie at any time, first to Maggie herself and subsequently to Patricia Costella.

-14-

**B.    Summary Of The Factual Allegations Contained In The Declarations In The Original Petition For Writ Of Habeas Corpus, The Return And The Traverse To The Return**

**The Original Petition (all references to exhibits are from the original Petition for Writ of Habeas Corpus which is not attached)**

1.    Nadia Chapman, Sharon Christi and Robin Guest all alleged that they were former girlfriends of Petitioner. All attested to having had normal sexual relationships with Petitioner and being of the opinion that it was unlikely that Petitioner had an abnormal sexual interest in children, and Maggie in particular, based on their observations and experiences with Petitioner. (Exhibits A, D, and E)

2.    In addition, Nadia Chapman was of the opinion that Maggie was a difficult and not particularly truthful child whom she found devious and manipulative. (Exhibit A)

3.    Further, Nadia Chapman indicated that Petitioner resided with her in Los Gatos between the end of 1992 and June of 1993, where Maggie shared a bedroom with her brother during weekend visitations. She never noticed anything that could have suggested that Petitioner was molesting Maggie at night.

4.    Phil Costella, Petitioner's father, stated that from the Fall of 1993 to early 1995, Petitioner worked with him at his machine shop and then it was sold to Gene Wilson. During that time, the weekend visitations with the children occurred at the Petitioner's parents' home, where Maggie and her brother shared a single room. Petitioner's parents never observed anything that would indicate Petitioner entered Maggie's room at night, let

alone molested her. Most of the time, the door to the children's room was left open. (Exhibit C)

5.    Declarations by Peter F. Goldscheider and Richard Fischer together established that Maggie had told the police that "Mrs. Johnson," a school counselor, was with her and her mother when she first revealed the molests. Mr. Fischer determined that no person by the name of Mrs. Johnson had ever worked at any school where Maggie was a student. (See Exhibits B and I )

6.    Allen Garton, a licensed psychologist for over 20 years, who had been qualified as an expert witness in Santa Clara courts on numerous occasions in both criminal and juvenile matters, stated that he had conducted a psychological evaluation on Petitioner following conviction. He also obtained a complete history from Petitioner, which included that fact that Petitioner had no prior record or had been accused of sexual misbehavior in the past. Although the evaluation was not done for the purpose of establishing Petitioner's guilt or innocence, the results of the MMPI-2 and the MCMI-II caused Dr. Garton to conclude that Petitioner had no predisposition to commit the crimes charged. Test results revealed that Petitioner showed no pathology or personality characteristics that would have led to a tendency to commit lewd and lascivious acts against children. In addition, Petitioner's sexual interests were adult oriented and there was no findings of a deviant orientation that would have suggested a psychopathic personality. He also did not exhibit any apparent impulse control problems. Also, as a result of Dr. Garton's testing, he stated

-16-

in his declaration, "I do not believe that it is likely that Mr. Costella could have committed the crimes charged of lewd and lascivious acts on his minor daughter." (See Exhibit F)

7.    Trial attorney Albie Jachimowicz stated that before trial, Petitioner had informed him that the molestations could not have taken place when and how Maggie had indicated and her allegations could be proven untrue by establishing a time-line of his living situation between 1992 and 1995. Mr. Jachimowicz stated, however, that he did not believe it fruitful to call Maggie a liar and hence conducted no investigation into Petitioner's statements that Maggie's version was either inaccurate or untrue. In addition he admitted not interviewing any of the previous girlfriends with regard to Petitioner's living situation or the alleged time-line. At no time did he state in his declaration the reason for not contacting Petitioner's girlfriends was because he was told not to do so by Petitioner. Rather, he stated he did not do so because he had not considered the issue at all. (See Exhibit H)

In addition, Mr. Jachimowicz stated that he did not consider using any lay opinions to establish the fact that Petitioner does not possess the personality characteristics of child molesters, including the opinions of women that Petitioner had dated that he was unlikely to have committed these offenses. He did not give a reason as to why he did not consider using such testimony.

With regard to the potential expert testimony, he stated that he was aware of case law that permitted such testimony, but did not consider using Dr. Garton or "another

comparable expert" during the trial. At no time did he mention having spoken to Dr. Abbott and having discussed this issue with him.

## The Return

1. Trial counsel Albie Jachimowicz stated for the first time in his declaration attached to the Return that Petitioner had "specifically told me that they [former girlfriends] would not be helpful and he did not want me to contact them." Mr. Jachimowicz gave no reason why Petitioner had given him the girlfriends' names on the time-line if they would not be helpful, and further did not detail why Petitioner would not have wanted these prospective witnesses contacted.

With regard to the use of expert and lay opinion on the issue of whether or not Petitioner had exhibited deviant sexual characteristics, trial counsel stated that he had found that such expert opinions were not helpful at trial. He gave no additional explanation as to why he had not considered using the lay opinions. Again, he made no mention of contacting Dr. Abbott or anyone else with regard to the use of expert testimony on the issue of Petitioner's personality characteristics.

2. The declaration by the trial prosecutor, Cameron Bowman, was also attached to the Return. It is not believed that the contents are pertinent to the issues to be decided by this court.

-18-

### The Traverse

1. Petitioner stated in his supplemental declaration that at no time did he ever instruct his trial counsel not to contact any witness, including his former girlfriends. Quite to the contrary, he reiterated that he had provided Mr. Jachimowicz a written time-line which included the names of prospective witnesses, as well as a time frame during which each witness was involved in his life. The time-line indicated that he did not move into the Willowdale address until June of 1993, which explicitly contradicted Maggie's version. He also reiterated that he had informed Mr. Jachimowicz about Maggie's propensity to lie and that this could be attested to, at least, by Nadia Chapman. He also stated that he had discussed with Mr. Jachimowicz his normal adult sexual relations with his former girlfriends and asked him if that could help.

2. Petitioner's former wife, Sherrie Costella, provided a declaration which corroborated Petitioner's allegations in several respects.

3. Finally, attorneys Eric Geffon, Steven Chase and the undersigned, provided declarations indicating how and under what circumstances the testimony of an expert witness who could opine that a criminal defendant charged with sexual molestation of minors did not possess sexual deviant characteristics, could be of assistance to the defense of such cases. This would be especially true at trial with a defendant like Mr. Costella, who had no prior record and where it would be apparent that defendant's entire background,

-19-

including his lack of criminal history, was being brought before the jury. (Exhibits F, G and H.)

The facts attested to by Sharon Christie, Robin Guest, Rich Fischer and those of the attorneys who had utilized expert testimony on the subject of sexual propensity were uncontradicted in the Return and in the declarations filed by Respondent. Also uncontested were references in the declaration by the undersigned as to the content of various police reports and the testimony at the Preliminary Hearing. As a result, it was argued, without opposition, following the remand to the Superior Court, that those facts should be deemed true under California's procedures for habeas petitions following the issuance of an Order to Show Cause. (California Rule of Court 4.551 subd.(d) states that, "any material allegation of the petition not controverted by the Return is deemed admitted for purposes for the proceeding." *In re Love* (1974) 11 Cal. 3rd 179, 193; *Rose v. Superior Court* (2000) 81 Cal. App. 4th 564, 574)

## C.    **Evidence Adduced At The Evidentiary Hearing**

### **Testimony of Petitioner, Attorney Jachimowicz, and Sherri Costella**

All RT references in this section pertain to the Evidentiary Hearing.

Petitioner testified that he had retained attorney Jachimowicz three months before trial specifically to try the case and that from the first time he spoke to Jachimowicz, Petitioner informed him that he was innocent. (RT 6-8) Petitioner believed that Maggie was fabricating the allegations against him, either as the result of his ex-wife's constant

-20-

disparaging him in front of the children and on the phone, or Maggie's intense dislike for him manifested on numerous occasions, most recently several months before she reported the molest to her mother and after he refused to pay for her college education. (RT 37) He pointed out that the accusations against him surfaced at the same time he was resisting his ex-wife's demands for increased family support. (RT 50) He also informed Mr. Jachimowicz that since 1996, Maggie had been barred from his home because of her disrespectful behavior and foul language. (RT 37) He informed counsel that Maggie was not always honest and recited various incidents, including one where she stole her grandmother's jewelry. (RT 24)

In addition, Mr. Costella informed Jachimowicz that based on his understanding of Maggie's accusations, it was impossible that the molests could all have occurred, as she described, every weekend at the Willowdale address in San Jose when Maggie was in the third, fourth and fifth grades. In this regard, Mr. Costella indicated that he and his wife had presented Mr. Jachimowicz with a written "time-line" of his living situations during this time period. (RT 9-10; attached at exhibit B) Other evidence, including the cover letter from Bernard Bray, Petitioner's prior counsel, established that he also received a copy of the time-line as part of the file that was delivered to Mr. Jachimowicz when he assumed representation of Petitioner. (See Exhibit 3) The contents of that time-line, according to Petitioner, were topics of his discussions with Mr. Jachimowicz, and included when and where he lived during the time periods when the molests allegedly occurred, the

-21-

visitations that took place during those times and the names of his ex-girlfriends, three of whom submitted declarations attached to the original Petition containing the information in their possession. (RT 140) Petitioner testified that he explained to Mr.Jachimowicz that this time-line, if corroborated, would refute many of Maggie's allegations as to when and where the alleged molests occurred. (RT 62) It was Petitioner's intent that Mr. Jachimowicz contact the witnesses whose names appeared on the time-line and anticipated that he would retain an investigator for this purpose. (RT 14, 27)

Specifically, the time-line indicates, among other things, and Petitioner so testified, that he only moved into the Willowdale address in June of 1993, following Maggie's completion of the third grade. (RT 16-17) Subpoenaed records from PG&E corroborated that testimony. (RT 17) Prior to that time and since the end of 1992, he had been living with Nadia Chapman in Los Gatos. During that time, his children shared a room during visitations. (RT 18) This information had even been provided to the investigating detective. (RT 142)

The time-line also indicates that Petitioner, after a knee operation in 1993, and for part of 1994 and 1995, stayed at his parents' house while he worked at his father's former machine shop, first on a part-time basis and then on a full-time basis starting in July of 1994 (RT 18, 23, 42) During that time period as well, the children shared a single room during their weekend visitations with Petitioner. (RT 20, 42)

-22-

Finally, Mr. Costella testified that he informed Mr. Jachimowicz of intimate

relationships he had had with adult females during this period of time, including Nadia

Chapman, Sharon Christie and Robin Guest, whose names appear on the time-line. (RT 15,

29, 76, 129, 140) He inquired whether these relationships could form the basis for a

defense as well. (RT 29, 140) In response to allegations by attorney Jachimowicz included

for the first time in his declaration attached to the Return, Mr. Costella also testified that he

never told his counsel not to interview these prospective witnesses and in fact requested

that Mr. Jachimowicz do so. (RT 29-30)

Mr. Costella further indicated that he discussed with Mr. Jachimowicz the

possibility of their presenting expert testimony regarding his normal sexual preferences, a

tactic that had been suggested to him by Colin Wright, Ph.D., with whom he had sought

counseling during the time he was represented by Bernie Bray, his prior attorney. (RT 32)

He indicated that he did not recall Mr. Jachimowicz responding to that idea at all. (RT 33)

According to Petitioner, Mr. Jachimowicz never indicated that he intended to

present a defense at trial that Maggie truly believed the allegations herself and somehow

had convinced herself that she had been molested because of the psychotropic medications

that had been prescribed for her or for any other reason. (RT 15) In fact, Petitioner never

heard of this idea until the end of the trial, presumably during the closing argument. (RT

39) Prior to that time, Mr. Jachimowicz would only say, with regard to his trial strategy,

that jurors did not like it when attorneys called witnesses liars. (RT 43) He learned when

-23-

the trial began, that Mr. Jachimowicz had conducted no investigation into Maggie's credibility or anything else. (RT 132, 248)

Nevertheless, Mr. Jachimowicz assured Petitioner that the case would be an "easy win" and a "slam dunk." (RT 26, 28)

In response to Petitioner's testimony, Mr. Jachimowicz acknowledged that he may have informed Petitioner that he believed the case to be a "sure win." (RT 254) He based his confidence on the pretext calls in which Petitioner had convincingly protested his innocence and the lack of physical evidence. (RT 196, 216) Although Petitioner had informed him from the outset that he was innocent and that he believed that Maggie was fabricating the allegations that she had been molested, he never retained or utilized an investigator for any purpose either before or during trial. (RT 224, 226) Although he claimed to have issued a subpoena duces tecum, he did not recall from whom or for what and no evidence was introduced by Respondent that such was the case. (RT 224)

Mr. Jachimowicz stated that Petitioner did not provide any reason as to why Maggie would have lied about the molests, and the possible motives suggested by Petitioner were, in his opinion, inadequate to argue to the jury that Maggie was lying. (RT 199) He acknowledged, however, that when interviewed by the police, Petitioner stated that he really did not know the reasons why Maggie would make up such an allegation and only assumed it was based on her hatred of him for not paying for her college education and for other reasons. (RT 228)

-24-

Mr. Jachimowicz denied that Petitioner had informed him of Maggie's misbehavior, including lying and the thefts of her grandmother's jewelry. He was aware of Mr. Costella's contentious divorce, but stated that these did not present issues, as far as he was concerned, and that only an "idiot" would consider impeaching a witness with such information. (RT 205, 209, 233-234)

Mr. Jachimowicz had little or no memory of the details of his strategy sessions with Petitioner, who was often accompanied by his former wife, Sherri, and kept no time records of the lengths of his meetings. (RT 214, 239, 262) With regard to the written time-line that he acknowledged had been provided by Mr. Bray, he initially stated that he did not remember it when he was shown a copy by the District Attorney prior to his testifying. (RT 183-184) In fact, he called his office after being shown the time-line at that time and was told that indeed it had been contained in the case file. (RT 183) He then testified, however, that he may have seen it at the time but "for whatever reason, I didn't pay much attention to it." (RT 259) He also stated later, "I didn't say I didn't read it." (RT 262.) He did vaguely recall there being at one point another time-line that he had seen at the time of the trial. (RT 184, 220) He stated, however, he did not know what had become of it and that he may have discarded it. (RT 183) In any event, its only use, according to Mr. Jachimowicz, had been to attempt to demonstrate that prosecution for the offenses should have been barred by the statute of limitations. (RT 282)

-25-

While he was shown police reports and a transcript of Petitioner's statement to the detective, Mr. Jachimowicz recognized the importance of being able to impeach Maggie with evidence that she did not live at the Willowdale address during part of the time period in which the molests allegedly occurred. He also professed to have no memory that such impeachment was available to him at the time. (RT 187-188, 229, 231, 256-258) Yet he testified that he had wished to speak with Nadia Chapman with regard to whether Maggie could have been molested as she described between 1992 and 1993. (RT 190)

Mr. Jachimowicz had no memory of discussing any of the other subjects covered by the time-line, including its specific references to Petitioner's girlfriends between 1992 and 1995, which at another point in his testimony he seemed to remember seeing, but stated that he had not payed much attention to it. (RT 185-186, 190-191, 259) Similarly, he had no memory of any of the other names listed on the time-line, including Sharon Christie, with whom the Petitioner had a relationship at the end of 1993.[2] Finally, Mr. Jachimowicz had no memory of the fact that the time-line referred to Petitioner becoming disabled in 1993 and seeing less of his children during that time. (RT 190)

Although Mr. Jachimowicz remembered Petitioner raising the possibility of using the fact that he had several adult intimate relationships during the relevant time frame, Mr. Jachimowicz believed such opinion testimony to be inadmissible. (RT 209, 259-260, 261)

---

[2]

   Petitioner initially believed that this relationship took place in 1994, but later recalled putting up Christmas lights at Christie's residence while she lived on Willowdale, placing this relationship in 1993.

He also had no memory of discussing the possibility of expert testimony with Petitioner, including the possibility of having Petitioner tested by use of a penile plethysmograph. (RT 214)  Although in his two declarations he had never mentioned consulting with Dr. Abbott or anyone else regarding the possibility of expert testimony on the subject of Petitioner's sexual orientation, he revealed that he had in fact done so, but that Dr. Abbott had felt the allegations to be too old. (RT 212, 278)  He indicated, however, that they had only discussed the Abel assessment. (RT 275)  When asked why he did not mention these facts in his declarations in which he stated he had not "considered" using such evidence at trial, Mr. Jachimowicz alternatively responded that he had chosen his words carefully in the declarations and also that he had forgotten about consulting Dr. Abbott. (RT 272, 278)  He had not considered consulting Dr. Garton because he had not used him in the past for such testimony. (RT 213, 280)

Mr. Jachimowicz testified on direct testimony, when being questioned by the District Attorney, that such expert testimony angered jurors and that it was not usually helpful.  On cross-examination, however, he stated that on occasion, he had, in fact, used such experts himself in his past cases and had found them valuable and agreed with the declarations by other defense counsel attached to the traverse in this regard. He did not recall any case law, however, that made such expert opinions admissible. (RT 274)

What Mr. Jachimowicz did claim to remember most distinctly was Petitioner's request that Mr. Jachimowicz not interview his ex-girlfriends. (RT 189, 206)  Although he

-27-

wanted to know details of the residences where Petitioner had lived, believed Nadia Chapman could have impeached Maggie with regard to when and how the molests occurred, and could have contacted Ms. Chapman and Petitioner's other ex-girlfriends if he had wished, he was dissuaded from doing so by Petitioner. (RT 206, 239, 288)  He had no recollection, however, as to when or why Petitioner made this request and he admitted that he made no attempt to find out what such reasons might be. (RT 262-263, 273)  He did state that he made no attempt to dissuade Petitioner from this inclination and did not pursue the matter further in any manner, apparently not believing it his duty to counsel his client on this issue. (RT 262-264)  He did not memorialize any of these discussions in any form. (RT 264)

No other evidence was presented or even suggested at the Evidentiary Hearing as to why Petitioner would have dissuaded him in this manner and Mr. Jachimowicz's claims were not substantiated in any manner whatsoever. When asked why, in his initial declaration and in his conversations with appellate counsel, he never mentioned that, after providing him with the names of his ex-girlfriends, Petitioner then instructed him not to contact them, Mr. Jachimowicz testified that he had never been asked why. (RT 207)  Only after he had the initial habeas petition, which he felt attacked him personally, and which "sickened" him did he feel compelled to explain why he had not contacted the witnesses. (RT 269, 271-273, 276)  He did not explain, however, why, when given the opportunity to make any changes in the declaration that he wished, he left in the language that he never

"consider[ed]" interviewing the ex-girlfriends. (RT 266, Exhibit G of original State Petition and attached hereto as Exhibit C)

Mr. Jachimowicz gave no explanation at all, however, as to why he did not interview Mr. Costella's parents as to the visitation arrangements from the end of 1993 through early 1995. (RT 208, 241) Of course, having not paid "much attention to it," he did not remember entries on the time-line that visitation took place at his parents' home during this time. (RT 240, 259) He did admit that Petitioner never told him not to contact his parents. (RT 242)

Mr. Jachimowicz testified early on that he developed the defense that Maggie had imagined the molests and that he had discussed that defense with Mr. Costella. (RT 200, 249-250) Although he argued at trial that this may have been due to her being prescribed psychotropic medications, at the Evidentiary Hearing he denied that that fact was related to his defense. (RT 201, Trial tx 680) He admitted that he had conducted no investigation and had no evidence to support that claim. (RT 250-251) Mr. Jachimowicz never explained why he did not engage or even consult with experts regarding this theory and did not give the basis for his belief that such a theory was scientifically sound and why it was more likely to be believed by the jury than directly attacking Maggie's credibility. He indicated also that he did not believe his defense that Maggie had honestly imagined the molests would have been buttressed by showing that she was incorrect in her recollections of where and when the molests occurred. (RT 255, 257-258) Mr. Jachimowicz acknowledged that

-29-

there were certain significant contradictions in Maggie's statements surrounding the alleged molests and their aftermath, but did not recall others present in the trial record or that existed based on statements she had made before trial. (RT281, 285, 290-291)

Contrary to his initial declaration which states that in his conversation with Deputy District Attorney Bowman, Mr. Jachimowicz was informed that Maggie's medical records contained no relevant information, he testified that Mr. Bowman stated that they raised "issues" of vaginal abnormalities. (RT 253-254) When the court inquired into this matter, he reiterated that they did not appear to substantiate the molestations described by Maggie. (RT 290-291) In his final argument, he stated as well that no medical evidence existed corroborating Maggie's claims. (See Reporter's Transcript p. 670.) Mr. Jachimowicz admitted that looking back on it, it might have been best if he had subpoenaed the records himself rather than rely on the prosecutor's description of what they contained. (RT 290) When Petitioner requested that the records that he believed were in the possession of the prosecutor be produced at the hearing, the Deputy District Attorney handling the Evidentiary Hearing denied having them. (RT 342)

Finally, although Mr. Bray's cover letter that accompanied his file indicated that Petitioner had already passed a polygraph exam, Mr. Jachimowicz first professed no memory of such a result and then incorrectly recalled that it had occurred in his office after he had taken over the case from Mr. Bray. (RT 225-226)

-30-

Sherri Costella, Petitioner's former wife, who had attended many but not all of the strategy sessions, testified that both she and Petitioner repeatedly urged Jachimowicz to contact his ex-girlfriends, including Nadia Chapman, who could attest to Petitioner's living situation during the time frame in question. (RT 364, 376, 368)  She specifically rejected the notion that Petitioner did not want his ex-girlfriends to be contacted. (RT 369, 389-390) Ms. Costella also stated that she brought with her a copy of the time-line and recalled discussions related to Petitioner's parents being able to attest to the overnight visitations at their residence during part of the relevant time period. (RT 370, 374)

She also remembered discussing specific instances related to Maggie's credibility, as well as her antipathy towards Petitioner. (RT 364, 373) Ms. Costella stated that Mr. Jachimowicz expressed no interest in pursuing these subjects. (RT 367-368)  She also recalled Petitioner mentioning his having had normal adult relationships during the period of time in which the alleged molests occurred.

Mr. Jachimowicz appeared uninterested in all of these subjects. He stated that the pretext calls would speak for themselves and would be enough to win. (RT 369)  Ms. Costella found Mr. Jachimowicz very confident of his abilities to win the case and called it a "slam dunk." (RT 372.)  Finally, Ms. Costella testified that never during any of the sessions she attended did Mr. Jachimowicz ever mention that he intended to raise the defense at trial that Maggie imagined and truly believed that the molests had occurred. (RT 370)

-31-

### Testimony of Nadia Chapman

Ms. Chapman voluntarily appeared to testify although she lived in Nevada. (RT 146) She stated that she lived with Petitioner in a three-bedroom condominium in Los Gatos between January and June 1993. (RT 147-148) Her son occupied one bedroom, she and Petitioner occupied another, and Petitioner's children shared the third one during the weekend visitations. (RT 147-149) She never saw Maggie bring a comforter with her that had lambs on it. (RT 163) Her and Petitioner's bedroom was approximately six to ten feet from the one utilized by Petitioner's children. (RT 149) At no time did she notice anything suspicious in Petitioner's relationship with his daughter, nor did she ever find evidence of sexual activity in the children's room. (RT 150-151) Although it appeared that Maggie was fond of her father, she did not find either to be unusually affectionate with the other. (RT 160, 166) According to Ms. Chapman, both she and Petitioner drank very little alcohol when the children were there. (RT 154)

Ms. Chapman did not find Maggie trustworthy or honest and things disappeared when she visited. (RT 153) She also described Maggie as "devious" and "manipulative." (RT 152) She described Maggie as outspoken, independent and not the kind of child that would be easily victimized. (RT 150, 153)

She stated that she was 10 years older than Petitioner and that they enjoyed a normal adult sexual relationship. (RT 154) Petitioner exhibited no abnormal sexual appetites,

including an interest in children, and in her opinion, he would not likely have committed the acts of molestation of which he was convicted. (RT 155, 158)

After Petitioner moved to the Willowdale address, Ms. Chapman visited him there several times when Maggie was present. (RT 165) She noticed no change in Maggie's relationship with her father. (RT 164)

### Testimony of Phil Costella, Gene Wilson and Terry Green

Terry Green testified that he began to work at Petitioner's father's former machine shop after Green's wife left him in January 1994 and that Petitioner and Phil Costella were working there already when he started in May or June 1994. (RT 175, 177) When Green joined the shop full time in July, Petitioner continued to work there. (RT 176) Gene Wilson purchased Phil Costella's machine shop in October 1992. (RT 293) Phil continued to work there for a while after that date but he did not recall until when. (RT 297) Further, he recalled Petitioner working there after Phil left and his records showed that Petitioner became a full-time employee in July 1994, but that he could have worked there as an independent contractor before then. (RT 296) He also stated that Terry Green was an independent contractor in 1994 before he became a full time employee, and that Petitioner was there before Green arrived. (RT 299)

Phil Costella, who is 79 years old, either because he had no written documentation as to when he sold his shop or because he was showing the signs of age, did not recall exactly in which years certain things transpired. (RT 353, 358, 406-407) The Superior

-33-

Court judge found, however, with regard to the key issues regarding visitation between Petitioner and his children that Mr. Costella clearly remembered the salient events. (RT 402) Petitioner's father testified that after he sold his machine shop to Gene Wilson, he continued to work there as an independent contractor until some time before his heart operation at the end of 1994. (RT 352, 360) He testified that Petitioner worked there before Terry Green arrived and continued working there afterwards as well.

Both before and after the time that Petitioner became a full-time employee of Gene Wilson, the children visited with Petitioner at his residence either every other weekend or at least once a month. (RT 360-361) By reference to a photograph, Mr. Costella indicated the room in which the kids stayed during the overnight visits, explaining that they used a hideaway bed at the time. (RT 354-355, 359) He stated he did not tell Investigator Morland that they slept on cots and the evidence was unclear as to when the cots were first placed in Phil's residence. (RT 359) When confronted directly by Sean Costella's testimony that it was rare that the children would spend the night at their grandparents, he kindly stated that Sean must be mistaken. (RT 361)

### Testimony of Sean Costella and Investigator Morland

Sean, who was seven years of age at the time the visitations allegedly took place, was aware that the issue at the hearing was whether his father would be granted a new trial based on when and where the visitations took place during the time his sister was allegedly molested. (RT 320) He had discussed the matter with his sister and mother even before

-34-

being interviewed by the District Attorney and was opposed to his father being re-tried. (RT 320-322)

Sean recalled staying overnight at his grandparents, and sharing a room with his sister three or four times, but stated it was not on a regular basis. (RT 315, 338)  He did not recall the precise time period in which this occurred. (RT 322-323)  He initially stated this had occurred only three or four times but admitted he was "just winging it" with that estimate and that the visitations could have occurred as often as once a month. (RT 315, 322)  He was never questioned as to whether he slept on a cot or on a hideaway bed on those occasions.  Sean recalled the incident in which Maggie had stolen her grandmother's jewelry. (RT 326)

Investigator Morland, who had never prepared a declaration prior to the hearing, had visited Phil Costella's residence and had been shown the room where the children slept when they stayed overnight in 1994. (RT 404)  According to Investigator Morland, Mr. Costella stated the children slept on cots rather than on a hideaway bed. (RT 400)  She never determined, however, whether the bedroom in which they stayed had either cots or a hideaway. (RT 405)  Nor did she determine whether the residence even contained cots. (RT 406)

Mr. Costella, having no paperwork anymore concerning the transaction, told Ms. Morland that he believed that he had sold his business to Gene Wilson in 1994. (RT 399,

405) He recalled, however, working with Petitioner at the machine shop after the sale. (RT 405)

## Testimony of Dr. Allen Garton and Brian Abbott

Dr. Garton, a forensic psychologist who had been retained by trial counsel for sentencing purposes, testified that he had conducted certain psychological tests on Petitioner in 2002. These included the MMPI, the Million and the Rohrshach. (RT 18, 85,103)

Based on those tests, Dr. Garton stated that he could have opined at trial that Petitioner did not possess the personality characteristics typical of a child molester and that in his opinion, it was highly unlikely that he could have committed the offenses of which he was convicted. (RT 92, 102, 108)  Specifically, Dr. Garton opined that Petitioner suffered from no psychopathology that could be a predictor of such behavior, he had no problem with impulse control and, in general, given his history, there were no "red flags" that suggested he committed the offenses. (RT 84, 91-92)  Although the passage of time between the alleged molests and the time he performed the tests diminished slightly their probative value, this did not significantly impair his opinion, in that the signs of sexual deviancy that the tests would reveal would not likely change over such a time period. (RT 112)

Dr. Abbott, who would have employed the Abel Sexual Deviancy Scale among others if he had done an evaluation, did feel that the passage of time diminished the utility

of such testing. (RT 304-305) As a result, offering such test results could have been harmful, but also could still have helped a defendant at trial. (RT 311) In addition, many sex offenders might not be detected through such testing, particularly when incest was involved. (RT 308) He did not dispute, however, that another psychologist might have a different opinion. Specifically, he did not contest Dr. Garton's qualifications, conclusions or choice of tests. (RT 312)

He testified that Mr. Jachimowicz did consult him prior to Petitioner's trial and that he informed counsel of his opinion that the value of Abel Sexual Deviancy Scale testing would be limited. (RT 304) Interestingly, he never indicated that Mr. Jachimowicz ever discussed with him the possibility that Maggie had honestly imagined that she had been molested as a possible defense at trial.

### Other Evidence

Documents from PG&E, to which the prosecutor stipulated, demonstrated that Petitioner first received utility service at the Willowdale address in June 1993. Further it was stipulated that Petitioner had informed his employer of the need for a disability leave in August 2003 because of knee surgery and that he had recently changed addresses. (RT 17)

## ARGUMENT

### I

### TRIAL COUNSEL PROVIDED INEFFECTIVE ASSISTANCE AT TRIAL BY FAILING TO INVESTIGATE MAGGIE'S CREDIBILITY, BY FAILING TO INVESTIGATE EVIDENCE THAT COULD HAVE BEEN ADDUCED FROM PETITIONER'S EX-GIRLFRIENDS AND BY THE FAILURE TO CONSIDER USING EXPERT TESTIMONY ON THE ISSUES OF WHETHER PETITIONER HAD THE PROPENSITY TO COMMIT THE CHARGED OFFENSES AND WHETHER MAGGIE COULD HAVE IMAGINED THE MOLESTATIONS

### A.    Standard of Review

This Petition is filed pursuant to the provisions of the Anti-Terrorism and Effective

Death Penalty Act of 1996 (AEDPA).  Therefore the provisions of that Act are applicable

to this case.  Under the provisions of AEDPA, this court may grant a Petition challenging a

state conviction or sentence when reviewed on the merits by a State Court when that

court's adjudication of the claim "(1) resulted in a decision contrary to, or involved an

unreasonable application of, clearly established federal law, as determined by the Supreme

Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State Court proceeding."

(28 U.S.C. §2254(d))

"Clearly established federal law, as determined by the Supreme Court of the United

States" refers to 'the holdings of that Court as opposed to the dicta, of the Court's decisions

as of the time of the relevant court decision. (*Williams v. Taylor* (2000)  529 U.S. 362,

412; *Lockyer v. Andrade* (2003) 538 U.S. 63, 71)  A State Court decision is "an

-38-

unreasonable application of" Supreme Court authority if "the State Court identifies the court governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *(Williams v. Taylor supra,* 529 U.S. 362) This court may not issue the writ simply because it concludes in its independent judgment that the relevant State Court decision is erroneous. Rather, that application must also be "unreasonable." *(Id.* at p.411)

This Court may also grant a Writ if it includes that the State Court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." (28 U.S.C. §2254(d)(2)) This court must presume as correct any determination of a factual issue made by a State Court unless the Petitioner rebuts the presumption of correctness by clear and convincing evidence. (28 U.S.C. §2254(e)1)

Where, as here, a California Court of Appeal and the California State Supreme Court deny Petitioner's claim of ineffective assistance of counsel without explanation, this Court must look to the last State Court decision in conducting the habeas review. *(Shackleford v. Hubbard* (9th Cir. 2000) 234 F 3rd 1072, cert. denied 534 U.S. 944 (2001) With regard to the ineffective assistance of counsel claim, the only State Court deciding that issue on the merits was the Superior Court which denied the State Petition for Writ of Habeas Corpus following the Evidentiary Hearing. If that Court rendered a reasoned decision but failed to supply the reasoning for its decision using federal standards,

independent review of the record is required to determine if the State Court clearly erred in its application of controlling federal law. (*Luna v. Cambra* (9th Cir. 2002) 306 F. 3rd 954, 960; *Pirtle v. Morgan* (9th Cir. 2002) 313 F. 3rd 1162, 1167)

With regard to allegations of ineffective assistance of counsel, a determination of whether counsel's representation was constitutionally ineffective, including whether counsel's performance was "unreasonable" and if so, whether such failing "prejudiced" a habeas Petitioner, is a mixed question of law and fact to which the State Court's rulings are entitled to no deference. (*Chacon v. Wood* (9th Cir 1994) 336 F. 3rd 1459, 1465) Hence, for example, if the State Court judgment finding that counsel's duty to investigate all defenses in this case was excused because of Petitioner's alleged lack of cooperation is unreasonable, it is not a finding to which this Court must in any respect accede or defer. (See e.g. *Thompson v . Keohane* (1995) 516 U.S. 99, 109-113)

Finally, where a State Court fails to make necessary findings of fact, as demonstrated by the record, no deference should be afforded to that State Court's resulting legal determinations. (*Taylor v. Maddox* (9th Cir 2004) 366 F. 3rd 992, 1000)

**B.    Analysis**

### 1.    Trial Counsel Was Ineffective When He Failed to Conduct a Thorough Investigation of Maggie's Credibility, Including Her Statements as to Where and When the Molest Occurred

At the Evidentiary Hearing ordered by the Superior Court following the issuance of the Order to Show Cause ordered by the California Supreme Court, it was irrefutably

-40-

established and recognized in the opinion rendered by the Superior Court that trial counsel Albie Jachimowicz conducted no investigation of the case whatsoever. Mr. Jachimowicz never even retained an investigator to corroborate Petitioner's claims that he could not have committed the molests when and where Maggie alleged, nor did he conduct any other investigation whatsoever into Maggie's credibility. Perhaps engaging in wishful thinking, at the Evidentiary Hearing, Mr. Jachimowicz imagined that he had had an investigator seated with him at counsel table. He also incorrectly recalled that a polygraph test administered to Petitioner before he took over the case, and which Petitioner successfully passed, had taken place at his office. (RT 203, 224, 227)

In this regard, it was uncontradicted that even though he had been provided a time-line of Petitioner's living arrangements between 1992 and 1995, both by prior counsel and Petitioner, which was contained in his own file at the time of the trial , Mr. Jachimowicz had no recollection that it was even contained in his case file before it was brought to his attention by the District Attorney prior to the commencement of the Evidentiary Hearing. That time-line, the pertinent parts of which (1992-1995) are attached hereto as Exhibit A, had been personally prepared by Petitioner as an aid to his attorneys and as a starting point to investigate his claim of innocence. The time-line contains the names of Petitioner's ex-girlfriends, some of whom have submitted declarations in support of the original state Petition for Writ of Habeas Corpus. Had the witnesses whose names were contained on the time-line been interviewed, including Petitioner's parents at whose home the visitations

-41-

took place in 1994 and part of 1993 and 1995, it would have established that it was impossible for the molests to have occurred where, when and how Maggie described.

At the Evidentiary Hearing, trial counsel offered no explanation or excuse for most of his omissions and offered a preposterous, illogical and uncorroborated excuse as to why he had not contacted Petitioner's ex-girlfriends. (See infra.) In fact, when each of Petitioner's ex-girlfriends were contacted by habeas counsel, each offered declarations that would have greatly assisted Petitioner's defense at trial. Their testimony would have established, among other things, the physical impossibility of facts testified to by Maggie, her not being a particularly honest child, as well as opinion evidence based on their observations that Petitioner could not have committed the instant offenses. In addition, despite the fact that each had been interviewed by investigators of the District Attorney's office following the filing of the habeas petition, none, including Nadia Chapman, who testified at the Evidentiary Hearing, provided any reason whatsoever why Petitioner would have been reluctant to have trial counsel call them as witnesses.

In addition to not investigating Maggie's allegations as to when and where the molests occurred, however, trial counsel failed to subpoena PG&E records that would have refuted part of Maggie's testimony in and of itself as to when and where the molests allegedly occurred, and he failed to subpoena Maggie's medical records, relying on the prosecuting attorney to tell him that there was nothing "relevant" in those records. He also failed to interview any witness who might opine on Maggie's credibility, including former

-42-

teachers, neighbors, or school counselors, etc., and failed to look for or interview the non-existent "Ms. Johnson," whom Maggie claimed at one point was present when she confided the molests to her mother. He also failed to contact therapist Quinn who, Maggie falsely testified, prescribed medications for her eating disorder.

With regard to the testimony of Nadia Chapman the evidence presented "incontrovertibly" demonstrated, in the words of the State Court, that during the school year of 1992-1993, Petitioner had not yet moved into the Willowdale residence, but rather resided in Los Gatos with Nadia Chapman, where Maggie and her brother shared a room during visitations. Maggie had testified that all the molests occurred at the Willowdale address:

Q:     "Now your recollection is that it continued to occur from the third grade, every other weekend and every single visit that your father had you and brother stay at *his* home, true?" (Emphasis added)

A:     "Yes, I believe it was every visit, every other time."

Q:     "And you would spend Friday and Saturday nights at *dad's house*, true?" [emphasis added]

A:     "Yes."     (Trial tx 203-204.)

In addition, trial attorney Jachimowicz admitted at the Evidentiary Hearing that Maggie's prior statements to the police, both to the initial reporting officer and to the investigating detective, were that all the molestations occurred at the Willowdale address.

-43-

(RT 186-187) The record further reflects she had so testified at the preliminary examination. (CT-PX 9-10) Furthermore, Maggie clearly stated that all the molests occurred while she had her own room, a situation occurring only at the Willowdale address. (Trial tx 178) She also distinctly associated the molest occurring at a time when she had a comforter on her bed with a design with lambs on it. (Trial tx 171.) Nadia Chapman clearly testified that she saw no such comforter in her home in Los Gatos at any time. (RT 164)

As proof that her recollection was not faulty and the result of her young age, Maggie had claimed at trial that she first came to realize the wrongfulness of what her father was doing during a specific third grade class when a police officer came to talk to students about inappropriate touching. She recalled the specific circumstances surrounding his lecture, including the name of the teacher, and it had clearly occurred in the third grade, a time prior to Maggie ever visiting the Willowdale residence or even staying overnight with her father in a residence where she did not share a room with her brother. (Trial tx 168-169)

Had Mr. Jachimowicz closely examined the possibility of such impeachment, he would have also been able to argue, as Petitioner suggested to him during their strategy sessions, that perhaps Maggie's accusations had been influenced by her mother, Patricia, in some manner. It is interesting to note that Patricia also testified at trial that she believed Petitioner was living on Willowdale in 1992. (Trial tx 353) While it is, of course,

-44-

unknown how Maggie and her mother would have explained this "coincidence" and other

obvious errors in Maggie's recollection, it is certainly reasonable to believe that the jury

may have found Maggie's otherwise unchallenged and seemingly straightforward

testimony less credible.

With regard to events contained in the time-line after Petitioner moved to the

Willowdale address, not even Mr. Jachimowicz claimed that there was any excuse for not

interviewing Petitioner's parents, who could have testified that after Petitioner suffered a

knee operation in August 1993, visitation between Petitioner and his children took place at

their home where it was virtually impossible that Petitioner could have molested Maggie.

Petitioner's father, Phil Costella, described in detail where the children stayed overnight

while Petitioner worked at his former machine shop. Together with the testimony of

Petitioner and Terri Green, the evidence established that Petitioner was working at the

machine shop from at least January 1994 until the end of the year.

Maggie had testified that *all* the molestations had occurred between 1992 and 1995

at Petitioner's home on Willowdale. Hence, along with Nadia Chapman's testimony, Phil

Costella's testimony would have established that it was impossible for Petitioner to have

molested Maggie during almost the *entire* time period in which she stated the molests

occurred.

Although recognizing that much of the omitted evidence would have substantially

impeached Maggie, the State Court opinion unreasonably concluded that no single piece of

-45-

the evidence, that could have been but was not adduced at trial, was sufficiently
"compelling" to warrant a new trial. In this regard, the State Court was both
"unreasonable" in not considering the cumulative impact of all the omitted evidence, but
also did not consider how a reasonable jury might have viewed such evidence. (See infra)
In addition, the State Court made either no or scant mention of the other investigation that
could have been conducted by trial counsel and would have resulted in testimony
establishing that Maggie was not a particularly honest child and that her testimony at trial
was untrue in numerous respects. (See supra.) No impeachment whatsoever, either
intrinsically or through extrinsic evidence, was offered by trial counsel on any of these
issues during the jury trial.

Trial counsel's acceptance of the prosecutor's claim that Maggie's medical records
contained "no relevant information" is particularly worthy of note. (Exhibit H, p.3 of
original Petition) Maggie claimed to having had full intercourse with Petitioner repeatedly
for years. According to Petitioner, she had the same pediatrician and regular exams all that
time. "No relevant information" to the DA could have meant no corroboration for
Maggie's claims. The absence of such corroboration could have exonerated Petitioner in
and of itself. As the court stated in *Rompilla v. Beard,* 125 S. Ct. 2456, 2466 (U.S. 2005), a
capital case:

"It is the duty of the lawyer to conduct a prompt investigation of the
circumstances of the case and to explore all avenues leading to facts relevant
to the merits of the case and the penalty in the event of conviction. The
investigation should always include efforts to secure information in the

-46-

possession of the prosecution and law enforcement authorities." 1 ABA
Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.). fn.6

Without the records themselves, just as in *Rompilla*, "defense counsel could have
had no hope of knowing whether the prosecution was quoting selectively" from the records
and whether exonerating evidence was contained within them. (*Id.* p. 2465)

Unfortunately, the contents of those medical records were not before the court at
the time of the Evidentiary Hearing and the prosecutor present disclaimed any knowledge
of their whereabouts. Under these circumstances, trial counsel's failure to subpoena them
himself and have them examined by a court in an in camera hearing is even more troubling.

If this court issues an Order to Show Cause in this matter, Petitioner will seek an
order of this court granting permission to conduct discovery so that those records can
finally be subpoenaed.

Trial counsel's basic excuse for all of these failings was that he had developed a
"strategy" not to "paint[ing] her as a liar." He testified that "juries don't like that." (Evid.
Hrg. p.43) Nevertheless, Petitioner had insisted that Maggie was lying and believed it was
due to her antipathy towards him as a result of a long history of acrimony and the fact that
he had eventually excluded her from his home. Mr. Jachimowicz stated he believed that
these reasons would not be understandable to a jury. Under these circumstances, however,
there was all the more reason to investigate Maggie's credibility.

Such a "tactical decision" can be given no deference. The United States Supreme
Court has recognized that it is a basic responsibility of counsel to perform a preliminary

-47-

investigation before deferring to his tactical choices. (*Kimmelman v. Morrison* (1986) 477

U.S. 365, 384; *Strickland v. Washington* supra. 466 U.S. at p. 695)  The Court stated in

*Strickland*, with respect to the duty to investigate, "counsel has a duty to make reasonable

investigations or to make a reasonable decision that makes particular investigations

unnecessary." Only "*after* thorough investigations of law and facts relevant to plausible

options" are counsel's strategic choices presumptively unchallengeable.  In other words, a

court reviewing allegations of ineffective counsel based on a failure to investigate must

conduct a circumstance–specific inquiry into all of the factors surrounding counsel's

approach to a case.  (*Wiggins v. Smith*  (2003) 539 U.S. 510; *Lewis v. Johnson* (3rd Cir.

2004) 359 F. 3rd 646, 659)

      Any failure to investigate and to introduce into evidence information that will

demonstrate a client's factual innocence or raise a reasonable doubt is presumptively a

deficient performance. (*Riley v. Payne* (9th Cir. 2003) 352 F. 3rd 1313)  Counsel's failure to

interview a percipient witness to a charged crime constitutes "constitutionally deficient

representation" per se. (*Anderson v. Johnson* (5th Cir. 2003) 338 F. 3rd 382, 391; see also

*Bryant v. Scott*  (5th Cir. 1994) 28 F. 3rd 1411 and *Blackburn v. Foltz* (6th Cir. 1987))  In

*Riley v. Paine, supra,* 352 F. 3rd 13, 18, counsel was deemed clearly ineffective for not

interviewing a witness who, although not an eyewitness to the crime, could have testified

to certain precursor events that could have established the defendant's fear of the alleged

victim in a self-defense case.

In *Lord v. Wood* (9th Cir. 1999) 184 F. 3rd 1083, 1096, the court found counsel's performance was clearly deficient when he failed to interview three witnesses who had material evidence as to his client's innocence. In that case as well, counsel was concerned with the defense's "credibility with the jury," because the witnesses were friends of the defendant. (*Id.* p. 1092) The court acknowledging the deference normally allowed trial counsel in tactical decisions stated, "We would nevertheless be inclined to counsel's judgment if he had made the decision not to present the three witnesses after interviewing them in person." (*Id.* p. 1095) The same lack of deference should apply in this case.

In addition, legions of cases have been decided holding that investigation by trial counsel into a complainant's credibility was essential for a fair trial (e.g *Franklin v. Henry* (9th Cir. 1997) 122 F. 3rd 1270, 1273; *Steinkuehler v. Meschner* (8th Cir. 1999) 176 F. 3rd 441; *Smith v. Wainwright* (11th Cir. 1984) 741 F. 2nd 1248, cert. den. 470 U.S. 1087 (1985).) The more serious the case, the more necessary and compelling the duty is to conduct a complete factual investigation. (*Profit v. Wainwright* (11th Cir. 1982) 685 F. 2nd 1127, 1247) Where the prosecution's entire case, as here, rested entirely on the testimony of one witness who made her accusations immediately after being forbidden from Returning to Petitioner's home, that duty was all the more compelling.

In a case that rings particularly similar to this case, in *Hart v. Gomez* (9th Cir. 1999) 174 F. 3rd 1067, the defendant was convicted of molesting his daughter during visits to a camping resort. His daughter testified that he never molested her when he was

-49-

accompanied by another adult. His girlfriend testified that she had been with them on all of the camping trips in question. Yet trial counsel did not introduce receipts and the girlfriend's personal calendar which corroborated her testimony. The court set aside that defendant's conviction, holding that if believed, that corroborative evidence could have led to the acquittal of Mr. Hart.

As previously mentioned, since trial counsel conducted *no* investigation, no presumption exists that he exercised a strategic decision not to introduce evidence that could have impeached Maggie's credibility. As our circuit court stated in *Sanders v. Ratelle* (9th Cir. 1994) 21 F. 3rd 1446, "Because counsel failed to investigate at all, calling his decision not to present this evidence as strategic 'strips that term of all substance'".(*Id.* p. 1456) Without at least a preliminary inquiry, any decision not to investigate any potentially meritorious defense is inherently unreasonable. (*Soffar v. Dretke* (5th Cir. 2004) 368 F. 3rd 441, 476-477)

Numerous other undisputed facts attest to the unreasonableness of trial counsel's "excuse" for not impeaching Maggie's credibility. First, although he claimed that juries "didn't like it" when children were called liars, he did precisely that, after all, in closing argument. (Trial tx. p. 677) That his excuses were nothing more than that, and not tactical decisions at all, is revealed by the fact that it was only at the Evidentiary Hearing, for the first time, that Mr. Jachimowicz testified that he had developed the theory early on, not that Maggie was lying, but that she had imagined the molests. He admitted, however, that

-50-

although he had retained Dr. Abbott to testify about the CSAAS, which pertained directly to why a child would not report a molest at the time it occurred, he never discussed this issue with Dr. Abbott, nor did he conduct any investigation into that defense theory either. Finally, he barely mentioned the possibility in his closing argument, and, since he had conducted no investigation to support it, he could not cite any evidence upon which to base this idea. (RT 680-681)

Even if that really had been his defense, a highly unlikely proposition in light of the record of the state proceedings, it would only have been corroborated by showing that Maggie was "incorrect" in so much of her testimony. *Foster v. Lockhart* (8th Cir 1993) 9 F. 3rd 722 is illustrative of this point. In that case, defense counsel decided not to present evidence that the client was impotent in that it was inconsistent with an alibi defense. Finding that defense counsel had erred by not presenting this evidence, the Court of Appeal declared that such evidence would have reinforced his alibi defense by showing that was even more unlikely that defendant had committed the crime. (*Id.* p.726)

The identical analysis is applicable here. Defense counsel ultimately wanted the jury to disbelieve Maggie's testimony. Obviously, this goal would have been bolstered by evidence that Maggie had not told the truth on other occasions. To put it succinctly, a "tactical decision to pursue one defense, does not excuse the failure to present another defense that 'would bolster rather than detract from [the primary defense]' [citation]." (*Foster v. Lockhart, supra,* 9 F. 3rd at p. 726)

-51-

In short, Petitioner's entire case depended on Maggie's credibility. Defense counsel irrationally elected not to use compelling evidence that Maggie was not a credible person, and this conclusion precluded Petitioner from having a fair trial. (*Franklin v. Henry, supra,* 122 F. 3rd 1270, 1273) Upon a careful comparison of what a trial would have looked like had trial counsel utilized the impeachment evidence available with the trial that was, in which Petitioner's anguished protestations of his innocence were uncorroborated, it is believed that this court will conclude similarly. As in *Raygoza v. Hulick* (7th Cir. 2007) 474 F. 3rd 958, 965, a new trier of fact may well approach "the case with fresh eyes," which the original jury "never had a chance to do." (*Id.* p. 965)

## 2. Counsel Was Ineffective When He Failed to Contact and Interview Petitioner's Ex-Girlfriends on the Issue of Whether, in Their Opinion, Petitioner Was Unlikely to Have Committed the Charged Offenses

Nadia Chapman, Robin Guest and Sharon Christie all provided declarations attached to the original Petition for Writ of Habeas Corpus that, in their opinion, and based on their observations and intimate relationships with Petitioner, he could not have committed the offenses charged. Nadia Chapman so testified at the Evidentiary Hearing and Respondent never contested that Ms. Guest and Ms. Christie would have so opined as well if given the opportunity. (See supra.) This testimony was admissible under California law and under the United States Constitution. (*People v. McAlpin* (1991) 53 Cal. 3rd 1289, 1309) relying on *Michelson v. United States* (1948) 335 U.S. 469, 476 [93 L.Ed. 168, 174, 69 S.Ct. 213])

At the Evidentiary Hearing, Mr. Jachimowicz admitted that he had been unaware of the applicable law that would have permitted the introduction of this evidence which would have corroborated Petitioner's protestations of his innocence. It is fundamental that trial counsel's performance falls below professional norms when he fails to adequately research the law and as a result of that failure, causes a potentially meritorious defense not to be presented. (*Smith v. Dretke* (5th Cir. 2005) 417 F. 3rd 438, 442; *Dixon v. Snyder* (7th Cir. 2001) 266 F. 3rd 693, 703).) Attorney Jachimowicz provided no explanation whatsoever as to why an attorney who had supposedly handled dozens of sexual assault cases would be unaware of a Supreme Court authority over 15 years old. Even if his lack of knowledge of applicable case law at the time he accepted Petitioner's case did not fall below professional norms, he cannot be excused for not researching the issue before the trial began.

Attorney Jachimowicz had stated, for the first time in a declaration attached to the Return, that Petitioner had instructed him not to contact these witnesses and so testified at the Evidentiary Hearing. Although he had had the opportunity to place this fact in his original declaration, a draft of which he edited in his own handwriting, he failed to do so. (Exhibit C; Exhibit G to state Petition Following Evidentiary Hearing; also Ev. Hrg. RT 266) At the hearing, this new-found allegation was disputed by Petitioner and Sherrie Costella. Mr. Jachimowicz had no memo to his file memorializing the conversation, was unable to provide any reason why Petitioner would have so instructed him, and stated he

-53-

was under no duty to ascertain why. In addition, he testified that he believed he was under

no duty to convince Petitioner that the investigation of these issues was necessary to his

defense, and conducted no preliminary investigation to determine whether a full

investigation of these witnesses would have been fruitful.

The State Court never addressed the merits of this claim or the prejudice that

accrued to Petitioner as a result of it not being produced at trial. Rather, despite the fact

that the girlfriends had been interviewed by District Attorney investigators after they had

submitted their declarations, and the investigators found no reason why their testimony

would have embarrassed or been adverse to Petitioner, the State Court accepted trial

counsel's preposterous claim that he was excused from his duty to investigate this matter

because of Petitioner's alleged lack of cooperation. Petitioner will request that this court

find the State Court's determination in this regard to be unreasonable, first, because clear

and convincing evidence establishes that Petitioner never dissuaded trial counsel

sufficiently to warrant this abdication of his duty to investigate the case fully. (Ev. Hrg RT

206, 239, 262-263, 273, 288) (28 USC § 2254 (d)(2); *Taylor v. Maddox* (9th Cir. 2004) 366

F. 3rd 992, 999)

Second, however, Petitioner alleges that even if trial counsel's improbable and last

minute excuse is accepted per se, it still does not excuse his failure to investigate and

interview Petitioner's ex-girlfriends. Even if a defendant admits committing the crime and

wants to plead guilty, where the evidence is questionable, counsel has a duty to investigate

-54-

evidence which is potentially unreliable or questionable. (*Harris ex. rel. Ramseyer v. Wood* (9th Cir. 1995) 64 F. 3rd 1432, 1437.) Mere uncooperativeness is no excuse whatsoever for not conducting at least a preliminary investigation where the defendant insists, as here, that he is innocent. (*Bryant v. Scott* (5th Cir. 1994) 28 F. 3rd 1411.) At most, trial counsel's vague testimony that Petitioner did not want to involve his ex-girlfriends resembles the facts in *United States v. Gray* (3rd Cir. 1989) 878 F. 2nd 701, 712, where the defendant was reluctant to involve potential witnesses or subpoena them to testify. Because the defendant had not made an "informed decision" and there was in fact no actual reason why counsel should not have investigated what the witnesses knew, the court ruled that counsel was not absolved of his duty to conduct at least a preliminary investigation. As here, the circumstances revealed not a tactical choice by counsel but a lack of diligence. (*Id.* p. 712)

The evidence here does not disclose any attempt by Petitioner to sabotage the defenses that could have been developed with the help of his ex-girlfriends. Nor did Mr. Jachimowicz even claim that Petitioner provided him any reason to believe that contacting the ex-girlfriends could harm the case. Trial counsel's explanation that it was not his duty to convince Petitioner that the girlfriends could be helpful may be his own style of representing clients, but as the foregoing authorities indicate, did not suffice as his duty under the law. Trial counsel was under a duty to work with his client and convince him of the importance of presenting evidence to support his denials, no matter how convincing trial counsel found Petitioner's denials to be in the pretext calls that he had molested

Maggie, and how strongly he felt that the case was a "sure win" and a "slam dunk." (RT

26, 28, 254)

3. **Trial Counsel Failed in His Duties When He Failed to Pursue the Possibility that Petitioner Did Not Have the Personality Characteristics of a Child Molester and When He Failed to Consult an Expert on His Theory that Maggie Had Imagined the Molest**

A. **The Failure to Call an Expert on the Subject of Petitioner's Personality**

Although he had at his fingertips a psychologist, Dr. Alan Garton, who could

have testified that Petitioner did not possess the personality characteristics of a child

molester, evidence that would have been admissible in State Court (*People v. Stoll* (1989)

43 Cal. 3rd 1138, 1154), trial counsel offered a variety of inconsistent excuses and reasons

why he had not produced such evidence at trial. Dr Garton testified at the Evidentiary

Hearing that while he had formed that opinion on his own, after Petitioner had been

convicted, trial counsel never broached the subject during the trial. In trial counsel's initial

declaration, he stated he "did not consider" such expert testimony, but would have done so

if he had the opportunity to do so again. In a later declaration, he stated he had considered

and rejected the idea because, in his experience, it would not have been helpful. Finally, at

the Evidentiary Hearing, he testified that he had considered such evidence but rejected the

notion based on his consulting with Dr. Abbott, although neither he nor Dr. Abbott had

ever documented such a discussion or mentioned it to anyone before they testified at that

hearing.

The real question is, whether by his supposedly brief consultation with Dr. Abbott on the subject, Mr. Jachimowicz indeed made a "tactical" choice not to seek to introduce this type of testimony, especially in light of the evidence that was available through Dr. Garton and the universal opinion of other experienced attorneys that such evidence could have been invaluable in the case of an accused with no prior record. (*Strickland v. Washington* (1984) 466 U.S. 668, 691)  This question must be analyzed in the context of several other factors: first, Mr. Jachimowicz's earlier denials that he ever considered using such testimony and his testimony that he never discussed the possibility of using such testimony with Petitioner suggests that he put little time or effort into formulating this "choice" of tactics; second, his complete lack of any other investigation must be considered in evaluating his current claims on the subject; finally, in light of what he testified his strategy actually was, to argue that Maggie had imagined the molests, and his commensurate failure to consider the use of a psychologist to support this defense, the conclusion that this was a well thought out tactical decision is hardly supported by the entire record.

Petitioner will ask this court to find that the Superior Court's finding that trial counsel had considered and rejected this avenue as a valid tactical choice to be both an unreasonable determination of the facts and an unreasonable application of *Strickland.* (28 U.S.C. § 2254 (d))

-57-

## B.    The Failure to Introduce Expert Testimony that Maggie Could Have Imagined the Molest

At the Evidentiary Hearing, Mr. Jachimowicz stated that rather than utilizing the defense that Maggie was lying, or that Petitioner did not have the personality characteristics of a child molester, he early on formulated the defense that Maggie had imagined the molests occurred. (RT 249) It was established at the Evidentiary Hearing, however, that Mr. Jachimowicz, even though he discussed the case with Dr. Abbott, and, in fact, called him as a witness at trial on the issue of the Child Sexual Abuse Accommodation Syndrome (CSAAS), he never contemplated using expert testimony to support this supposed defense.

If Mr. Jachimowicz reasonably rejected using psychological testimony to establish Petitioner's personality traits because of his conversation with Dr. Abbott, he certainly must be considered to have rendered ineffective counsel for his failure to investigate, when he had the opportunity to do so, the use of such testimony with regard to his chosen defense. This failure, together with the aforementioned failures to investigate in any way the factual basis for such a defense, including not subpoenaing Maggie's counseling or medical records, must constitute ineffectiveness of counsel. In other words, he cannot have it both ways: if Mr. Jachimowicz was not ineffective in not using a "lack of propensity" defense at trial because he investigated and rejected that possibility early on, then he was ineffective in not investigating the possibility of employing expert testimony with regard to the defense, which he claims he developed early in his representation of Petitioner.

-58-

The *Soffar* case is instructive here as well. In addition, for finding counsel ineffective for not interviewing the only eyewitness, the Ninth Circuit also found him ineffective for not consulting with a forensic expert in ballistics. The court stated that where the State's case was based so much on this type of evidence, it was incumbent on counsel to at least preliminarily determine if the State's evidence was subject to impeachment.

The same analysis applies here. Since the People's case was based exclusively on Maggie's testimony and counsel intended to offer the defense that for psychological reasons, she was imagining the molests, consulting an expert in this field was essential. In fact, counsel was far more derelict in not doing so when the goal presumably was to discredit the key witness entirely rather than merely presenting affirmative character evidence to support the argument than Petitioner was sexually normal. Not only is any impeachment of an important aspect of the government's case always admissible, but reversal is required where it is precluded. (*Franklin v. Henry, supra,* 122 F. 3rd 1270, 1273)

Counsel's defense really was no defense at all. He never mentioned the possibility that Maggie imagined the molests during his opening statement, introduced no testimony to corroborate it and by not challenging Maggie's credibility, at least as to the accuracy of her recollections, was left with no factual basis to argue the possibility in his closing argument, as he did very briefly.

-59-

Trial counsel's performance substantiates that his "tactical choice" not to pursue an impeachment of Maggie's credibility was nothing more than an accommodation for his own lack of investigation.

## 4.  Taken in its Totality, the Cumulative Effect of Trial Counsel's Omissions Resulted in Petitioner Being Deprived of a Fair Trial, the Outcome of Which is Presumptively Unreliable

The prejudice that resulted from trial counsel's numerous omissions can best be seen by comparing the trial that was with the one that might have been .

In presenting his case, the prosecutor relied virtually exclusively on statements Maggie had made to others years after she claimed the molests allegedly occurred. Yet not a single reason was offered as to why Maggie would have the motive to lie, why her credibility should have been questioned or how she could have imagined the molests if she truly believed in her allegations. By failing to produce any evidence that would have undermined Maggie's credibility, including evidence that the molests could not have occurred at the time and places that Maggie indicated, Mr. Jachimowicz deprived the jury of any reason not to believe Maggie. Had defense counsel performed competently, an entirely different picture would have been presented to the jury.

The jury would have learned that Maggie was not an entirely credible individual, and, in fact, had displayed significant problems with adults over the course of her life. In addition to the extrinsic evidence discussed above, Maggie was subject to impeachment by her own statements as well. Maggie's credibility also might have been significantly called

-60-

into question if her irreconcilably inaccurate statements regarding having told a non-existent Ms. Johnson about the molests at the same time she told her mother, having been prescribed medications by Ms. Quinn and as otherwise previously discussed, been introduced.

In addition, by presenting a complete time-line of Petitioner's life from 1992 to 1995 and supporting it with irrefutable evidence, the defense would have been able to cast significant doubt on Maggie's statements both before and during the trial that all the molests occurred every time she visited Petitioner and that they all occurred at the Willowdale address. The testimony from Nadia Chapman stands unrebutted, as does the PG&E service start date. The testimony from Phil Costella, Sean Costella, Terry Green and even Gene Wilson, should have been and should be a matter for the jury's consideration. They could reasonably find that Maggie's failure to even note sharing a room with her brother at Nadia Chapman's, or the overnight visitations at the grandparents' home where the molestations also could not have occurred as alleged, raised a reasonable doubt that the molests occurred at all. Even if Sean Costella's testimony was believed in full, it would not significantly impeach this evidence. Petitioner only claims that the overnight visitation at his parents' house occurred twice a month on most, but not all, the weekends in 1994. It is not impossible that a child, who was only seven at the time, would forget twelve years later about the regularity of the scheduled visitations. In addition, Ms. Morland's testimony that the children slept on cots does not significantly impeach the

recollections of a decade ago. Even her motive for fabricating the molests, which Mr. Jachimowicz found difficult to argue, could have been developed. Maggie was aware that her mother actively and regularly demanded money from Petitioner, sums he was unable and in her mind, unwilling to pay. And it could have been shown that it was Petitioner who forbade her from visiting his house, not Maggie who initiated that decision. (Trial tx 390) Further, Maggie's initial "disclosures" to her friends were made immediately after that occurred. It could have been demonstrated that Maggie had exhibited extreme hostility toward Petitioner immediately before she made her accusations. Further, this occurred after she was caught lying to her mother on a variety of subjects and after her mother informed Maggie that she could no longer live with her. By bringing the allegations at that time, Maggie was able to preserve both her living situation and college funding.

The jury would also have learned three women with whom Petitioner had had sexual relationships during the time period in question, believed Petitioner to be an individual with normal sexual tastes, one who in their opinion would not have committed the crimes charged. They also would have learned that Dr. Garton's psychological testing supported that conclusion. In short, this case presents a classic instance where defense counsel failed to adequately test the credibility of the government's case, on the one hand, and introduce affirmative evidence that would have attested to Petitioner's "good character." Both types of evidence could have raised a reasonable doubt regarding Maggie's allegations.

-62-

Instead of being presented with a complaining witness with no motive to lie or questions about her credibility, the jury would have at least had more information about her accuracy in reporting the events and understanding that there were some adults who believed that she was manipulative enough to lie. Instead of it being portrayed as a man with a motive to obtain illicit sexual satisfaction, the jury would have at least known that he enjoyed an active sexual life with adult women.

The Superior Court's Final Order was an unreasonable determination of the facts and/or an unreasonable application of *Strickland* in at least three respects in its analysis of the prejudice engendered by trial counsel's foregoing failures to present the aforementioned evidence: first, the Court misunderstood the potential significance of Nadia's Chapman's testimony as previously discussed, which could have assisted the defense in multiple respects; second, it failed to consider the other myriad ways that trial counsel could have demonstrated as inaccurate Maggie's recitations of fact, whether in aid of the defense that she was fabricating the molests or that she imagined them. The Court did not find any single piece of omitted evidence "compelling" but failed to weigh the cumulative effect of this evidence and how the jury may have viewed the case differently.

The United States Supreme Court has clearly instructed that in assessing the prejudice from omissions of counsel that the resulting prejudice must be "considered collectively, not item-by-item." (*Kyles v. Whitley* (1995) 514 U.S. 419, 436)  In addition, the Court recently stated in *House v. Bell* (2006) 547 U.S. 518, 126 S. Ct. 2064,  that "the

-63-

habeas court must consider 'all the evidence', old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial'... Based on this total record, the court must make a 'probabilistic determination, properly instructed *jurors* would do...' [citation omitted] The court's function is *not* to make an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable *jurors.* " (*House,* at 126, S. Ct. at 2077)

Hence, in addition to the Superior Court failing to consider the totality of the evidence that trial counsel failed, without adequate cause, to produce at trial and its impact, it substituted itself for the jury resolving conflicting inferences against Petitioner. In so doing, it misapplied applicable habeas principles.

Further, the test as to whether prejudice occurred is not outcome determinative and does not require the defendant to show "that counsel's deficient conduct more likely than not altered the outcome in the case." (*Strickland v. Washington* p.693) Rather Petitioner need only show that counsel's errors were "sufficient to undermine confidence in the outcome" of the trial. (*Id.* p.694)  In fact, trial counsel's failure to test the prosecution's case was so complete, the adversary process was presumptively unreliable and warrants a presumption of prejudice. *(United States v. Cronic* (1984) 466 U.S. 648, 657-658)

By not demonstrating through verifiable and irrefutable evidence that Maggie was at least incorrect in so many respects, not even necessarily lying, defense counsel's so-called

-64-

strategy was inherently and fatally flawed. Even without such impeachment, the record here shows that this was a very close case and that the jury carefully considered whether Petitioner was guilty. The jury deliberated for half a day on January 8, and an entire day on January 9, and only Returned their verdict in the early afternoon of January 10th. During their deliberations, they asked for a read-back of Maggie's testimony, and, significantly that of Ali Nazari. (CT 192-197)

Defense counsel testified that in the pretext call conversations arranged and recorded by the police, Petitioner's denials that he molested his daughter were so convincing that those denials themselves should have constituted reasonable doubt for the jury. To have relied upon that evidence alone, however, cannot be deemed a reasonable trial strategy. No matter how convincing those denials may have been, however, they alone could never have been sufficient to raise a reasonable doubt. The jury had been given no reason to disbelieve Maggie. At a new trial, a jury would be provided more than Petitioner's anguished protestations of his innocence. They would be provided the reasons to believe him.

## II

### PETITIONER'S CONVICTION FOR THE VIOLATION OF PENAL CODE SECTION 288.5 WAS UNLAWFUL IN THAT THE ACCUSATORY PLEADING WAS FILED AFTER THE EXPIRATION OF THE STATUTE OF LIMITATIONS AND ITS REVIVAL WAS BARRED BY *STOGNER V. CALIFORNIA*

In *Stogner v. California* (2003) 539 U.S. 607, the United States Supreme Court

decided that a law enacted after the expiration of a previously applicable limitations period

violated the *Ex Post Facto* Clause. The statute before the court was California Penal Code

section 803 (g), which permitted such revival where (1) a victim reported an allegation of

abuse to the police, (2) "there is independent evidence that clearly and convincingly

corroborates the victim's allegation," and (3) the prosecution is begun within one year of

the victim's report. 1993 Cal. Stats. ch. 390, §1.

Count One alleging the violation of 288.5 specified that the three acts which formed

the basis for the prosecution occurred between May 1, 1992 and December 31, 1994.

Count Two alleged a single violation occurring between January 1, 1995 and December 31,

1995. The statute of limitations in effect at that time for both offenses and until December

31, 2000, was six years as specified by Section 800.[3] Thus, the ordinary limitations period

for Count One expired on December 31, 2000. However, subdivision (f) of section 803

permitted a filing after the ordinary statute of limitations had expired if another act in

---

[3]

Beginning on January 1, 2001 the statute of limitations became 10 years for any
limitations period specified in Section 800 that had not yet expired. (Subds. (h)
renumbered as (I) the following year.)

"violation of Section 261, 286, 288, 288 (A), 288.5, 289, or 289.5 against the same victim . . ." occurs within the normal section 800 period.

On December 31, 2000, Appellant had still not been prosecuted for the 288.5 violation. Nor had he been prosecuted for the violation of section 288a, but was still was subject to prosecution with the normal limitations period because of the change in law effective January 1, 2001. When he was prosecuted for the first time in 2002, it was only because of the extension of the limitations period to ten years in 2001 that the prosecution for the 288a count was possible. While such an extension for the 288a count may have been permissible, because it was effected before the six-year period had elapsed, the use of the 2000 amendment, effective January 1, 2001, to revive the limitations period for the 288.5 count, violates ex post facto principles in that the 288.5 was no longer subject to prosecution after December 31, 2000.

Such a method of "reviving" an expired statute of limitations was precisely what was condemned in *Stogner*. There is no essential difference between reviving a statute supported by "independent evidence that clearly and convincingly corroborates the victim's allegation." ((g)(2)(B), and the method prescribed in (f). As the Supreme Court concluded, any "law enacted after expiration of a previously applicable limitation period violates the *Ex Post Facto Clause* when it is applied to reviving the previously time-barred prosecution."

-67-

Appellant's conviction for Count One was time barred and his conviction for that offense must be vacated.

## CONCLUSION

**WHEREFORE**, it is respectfully requested that this Court issue an Order to Show Cause compelling the State of California to demonstrate why this court should not issue a Writ of Habeas Corpus with regard to Petitioner's application, vacating his conviction and sentence.

I verify, under penalty of perjury, that all of the factual statements pertaining to events in the state proceedings are true and correct.

Dated:    2/1/05

David Louis Costella by pef

David Louis Costella
In Pro Se
By Peter F. Goldscheider, Esq.

-68-

# EXBIBIT A

1
2
3
4
5
6
7

**F I L E D**

APR 27 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA/County of Santa Clara
BY _____ DEPUTY

8          **SUPERIOR COURT OF CALIFORNIA**

9             **COUNTY OF SANTA CLARA**

10

11   In re

12        **DAVID LOUIS COSTELLA,**

13   On Habeas Corpus

14

15

Cal. Supreme Court No.: **S129092**
Sixth Dist. Case No.: **H025751**
Trial Court No.:  **CC246905**

**FINAL ORDER**

16      Following a four and a half day jury trial and two days of

17   deliberations, on January 10, 2003, Petitioner was convicted of one

18   count of Penal Code § 288.5(a) (continuous sexual abuse of a child under

19   14) and § 288(a) (lewd and lascivious act on a child under 14).

20      Petitioner appealed to the Sixth District Court of Appeal and filed

21   a parallel petition for writ of habeas corpus. On October 1, 2004, the

22   Sixth District affirmed Petitioner's conviction on appeal. On the same

23   day, the Sixth District also denied Petitioner's writ.

24      Petitioner petitioned for relief with the California Supreme Court,

25   which granted review on the Sixth District's denial of the writ of

26   habeas corpus. On January 12, 2005, the California Supreme Court vacated

27   the Sixth District's order denying the petition and ordered the Sixth

1

1  District to issue an order to show cause on the issues of whether

2  Petitioner received ineffective assistance of counsel for failing to

3  investigate evidence regarding the victim's credibility and for failing

4  to adduce and present expert testimony that Petitioner did not have the

5  characteristics of a sexual assailant.

6      The People filed a Return to the Order to Show Cause on March 23,

7  2005. Petitioner filed his Traverse, which contains declarations in

8  response to the People's Return, on May 27, 2005. Due to factual

9  disputes raised, this Court ordered an evidentiary hearing on August 15,

10 2005. The People filed a pre-hearing brief on November 30, 2005, and

11 Petitioner filed a pre-hearing brief on December 19, 2005. The

12 evidentiary hearing took place before this Court on December 19, 20, &

13 23, 2005. The People filed post-hearing briefing on January 3, 2006, and

14 Petitioner filed post-hearing briefing on January 17, 2006. On February

15 24, 2006, this Court ordered the People to provide a complete transcript

16 of the closing arguments from Petitioner's original trial.

17     This Court has reviewed all of the above described filings, as well

18 as the trial transcript and the testimony of witnesses and evidence

19 presented at the evidentiary hearings. Accordingly, this Court rules as

20 follows:

21

22     A defendant has a Sixth Amendment right to effective assistance of

23 counsel in a criminal trial. (*People v. Ledesma* (1987) 43 Cal.3d 171,

24 215 (under both the United States and California constitutions);

25 *Holloway v. Arkansas* (1978) 435 U.S. 475, 481 (under the United States

26 Constitution).)

27     "[T]he <u>burden</u> of proving a claim of inadequate trial assistance'

1 rests upon the habeas corpus applicant." (*People v. Madaris* (1981) 122

2 Cal.App.3d 234, 241; emphasis in original.) A petitioner must make a

3 showing, first, that the errors committed by his attorney "fell below an

4 objective standard of reasonableness . . . under prevailing professional

5 norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688.)

6     Second, a petitioner must show a "reasonable possibility that, but

7 for counsel's unprofessional errors, the result of the proceeding would

8 have been different. A reasonable probability is a probability

9 sufficient to undermine confidence in the outcome." (*Id.* at 693-94.);

10 *see also People v. Ledesma, supra*, 43 Cal.3d at 215-218.) If courts can

11 dispose of an ineffective assistance of claim on the basis that the

12 defendant has failed to establish any prejudice, then the performance

13 prong need not be reached. (*Strickland v. Washington, supra*, 466 U.S. at

14 697.)

15     "Under this right, the defendant can reasonably expect that in the

16 course of representation his counsel will undertake only those actions

17 that a reasonably competent attorney would undertake. But he can also

18 reasonably expect that before counsel undertakes to act at all he will

19 make a rational and informed decision on strategy and tactics founded on

20 adequate investigation and preparation. [Citations] If counsel fails to

21 make such a decision, his action -- no matter how unobjectionable in the

22 abstract -- is professionally deficient." (*People v. Ledesma, supra*, 43

23 Cal. 3d 171, 215, *citing In re Hall* (1981) 30 Cal.3d 408, 426; *People v.*

24 *Frierson* (1979) 25 Cal.3d 142, 166.)

25     "Reviewing courts defer to counsel's reasonable tactical decisions

26 in examining a claim of ineffective assistance of counsel [Citation],

27 and there is a 'strong presumption that counsel's conduct falls within

the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437, *citing People v. Wright* (1990) 52 Cal.3d 367, 412, and *quoting Strickland v. Washington, supra,* 466 U.S. 668, 689.) "'[W]e accord great deference to counsel's tactical decisions' [Citation], and we have explained that 'courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight' [Citation]." (*People v. Jones* (2003) 29 Cal. 4th 1229, 1254, *quoting People v. Frye* (1998) 18 Cal.4th 894, 979, and *People v. Scott* (1997) 15 Cal.4th 1188, 1212.)

"Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

"Finally, the burden of proof that the defendant must meet in order to establish his entitlement to relief on an ineffective-assistance claim is preponderance of the evidence." (*People v. Ledesma* (1987) 43 Cal. 3d 171, 218, *citing In re Imbler* (1963) 60 Cal.2d 554, 560.)

**THE ALLEGED FAILURE OF COUNSEL TO INVESTIGATE THE VICTIM'S CREDIBILITY**

The testimony at trial of the victim indicated that the acts for which Petitioner was convicted began when the victim was in third grade, sometime during the school year of 1992-1993. She described the acts as happening in her *own* room at Petitioner's Willowdale residence.

The new evidence presented on habeas corpus, in the form of the testimony of Nadia Chapman, incontrovertibly indicates that, during the school year of 1992-1993, Petitioner had not yet moved into the Willowdale residence and had been residing with Chapman, where the children *shared* a room.

4

1    However, the evidence on habeas corpus conflicted as to whether
2    Petitioner had instructed trial counsel to contact or not to contact
3    Chapman to corroborate Petitioner's living arrangements while the victim
4    was in third grade.

5    At the evidentiary hearing, Petitioner testified that he did
6    instruct trial counsel to contact Chapman; however, trial counsel
7    testified that Petitioner did the opposite and told him not to contact
8    her and other potential witnesses. Petitioner's ex-wife, Sherri
9    Costella, testified that she was present when Petitioner instructed
10   trial counsel to contact Chapman and other witnesses; however, she also
11   admitted that she was not present during all of the meetings between
12   trial counsel and Petitioner.

13   This Court finds the testimony of trial counsel more credible.
14   "Trial counsel cannot be faulted for failing to take steps that require
15   cooperation his client declines to give." (*People v. Haskett* (1982) 30
16   Cal.3d 841, 853.) If Petitioner told his trial counsel not to contact
17   his ex-girlfriends, then trial counsel cannot be faulted for not
18   pursuing these witnesses.

19   Moreover, regardless of trial counsel's credibility, Petitioner has
20   failed to show the existence of prejudice. The evidence presented at the
21   evidentiary hearing did not provide any compelling "new" evidence not
22   already presented at trial.

23   Petitioner, at trial, testified that he did not move into the
24   Willowdale residence until the summer of 1993. In addition, this fact
25   was repeated during his interview with the police detective. The People,
26   at trial, introduced no evidence to refute this fact.

27   In addition, the victim's testimony about where the sexual conduct

5

1 | first occurred was not completely unequivocal. While she told
2 | investigating officers that the acts took place at the Willowdale
3 | residence, the victim testified at trial that she "believed" that the
4 | acts first occurred in the Willowdale residence and that she wasn't able
5 | to remember the exact time the first acts took place. She was also
6 | uncertain as to whether she had a brown dresser and desk at the time,
7 | but was sure that she had this furniture at the Willowdale residence. At
8 | any rate, she was certain that the acts took place on her bed on a
9 | comforter that had lambs on it. Moreover, she indicated that she had had
10 | that same bed since the age of four. Therefore, the victim was only
11 | certain and unequivocal about the acts as having taken place on a
12 | particular bed with a particular comforter, not a particular residence.
13 | Petitioner has presented no evidence as to where the victim's bed was
14 | during this period of time.

15 | Furthermore, trial counsel's defense was not to attack the victim's
16 | credibility by painting her as a liar, but to show that she had imagined
17 | that the acts took place. Since the trial record shows that it was
18 | uncontested that Petitioner did not live at the Willowdale residence
19 | when the victim was in the third grade, trial counsel could have engaged
20 | in the exercise of reasonable professional judgment by not seeking to
21 | investigate further corroborating evidence of Petitioner's living
22 | arrangements during 1992-1993. It was already uncontested that the
23 | molests could not have occurred at the Willowdale residence while the
24 | victim was in third grade. Instead, counsel chose to focus on the
25 | victim's delay in reporting the crime to show that the molests were
26 | imagined.

27 | Moreover, Chapman's testimony regarding the victim's propensity to

1  lie related to, as trial counsel characterized, "typical teenage
2  maladies." Therefore, such testimony was marginally relevant and
3  conflicted with trial counsel's strategy to not attack the credibility
4  of a potential child victim for fear of turning off the jury.

5      In fact, the motives offered by Petitioner to explain why the
6  victim would lie about the sexual molests could also provide evidence to
7  bolster the victim's credibility. The victim's allegations did not
8  surface immediately after Petitioner banned her from his household or
9  after he refused to pay for her college expenses. Instead, they arose
10  later on when the victim's mother threatened to force her to live with
11  her father. These facts could be argued to reflect a victim who was
12  willing to hide potentially embarrassing and painful memories of sexual
13  misconduct until confronted with the prospect of living again with the
14  person who molested her.

15      Finally, Petitioner has failed, by a preponderance of the evidence,
16  to prove that his living arrangements after 1993 also were inconsistent
17  with the victim's testimony. Petitioner's key witness on this issue, his
18  father Phil Costella, had difficulty remembering when his grandchildren
19  stayed with him, and his testimony directly conflicted with that of his
20  grandson and that of shop owner Eugene Wilson. Therefore, even assuming
21  that trial counsel erred by not investigating this portion of
22  Petitioner's timeline, Petitioner has failed to show prejudice.

23
24  **THE ALLEGED FAILURE OF COUNSEL TO PRESENT EVIDENCE OF PETITIONER'S NON-PROCLIVITY FOR SEXUAL DEVIANCY**

25

26      Petitioner has failed to show, by a preponderance of the evidence,
27  that trial counsel failed to investigate and present a defense that

1  Petitioner did not have the personality characteristics of a pedophile.

2      The experts presented by both sides agreed that the passage of time
3  between the molests and the time of trial diminished the probative value
4  of any pre-trial personality tests of Petitioner. Dr. Brian Abbott, in
5  particular, who has previously testified on numerous occasions as to the
6  results of personality testing, indicated that the passage of time
7  significantly reduced the probative value of such testing. In contrast,
8  Petitioner's expert, Dr. Allen Garton, who had never previously
9  testified regarding the sexual proclivities of an adult child molester
10 and did not normally conduct such tests, attached more weight to such
11 testing. Dr. Abbott's assessment was far more credible, given his
12 experience.

13     As a result, even assuming that trial counsel erred by failing to
14 procure such an expert to conduct such testing, Petitioner has failed to
15 show prejudice. Any personality testing of Petitioner would have taken
16 place years after the molests had allegedly taken place and would have
17 had little bearing on Petitioner's mental state at that time. In fact,
18 Dr. Abbott believed that the jury might reject any such testimony to
19 Petitioner's detriment.

20     Finally, even if trial counsel was mistaken as to the admissibility
21 of the opinions of his ex-girlfriends regarding any observed proclivity
22 to molest his daughter[1], Petitioner has again failed to show prejudice.

23     At the evidentiary hearing, Petitioner only presented Chapman's
24 testimony on this subject. Nonetheless, this testimony still conflicted
25 with trial witness Geraldine Ferrari's claim that she did observe

26

27 [1] *People v. McAlpin* (1991) 53 Cal.3d 1289, 1309 (holding admissible the testimony of female character witnesses regarding their belief that the defendant is not a person given to lewd conduct with children based on their personal observations of his interactions with his daughter or his sexual behavior with them as adults)

8

abnormal behavior. Given the circumstantial nature of such evidence, it is highly unlikely that such testimony would have affected the outcome of the proceedings.

Trial counsel was, by no means, a perfect advocate. He admitted to the existence in his case file of Petitioner's timeline of his residences, living arrangements, and girlfriends, yet counsel stated that he saw this timeline, for the first time, only just before his evidentiary hearing testimony. In addition, trial counsel's closing arguments were somewhat inconsistent with a strategy of not attacking the victim's credibility in that his closing argument inferred that the victim's "angry letter" homework assignment has been fabricated. However, such errors do not mean that Petitioner's faulty representation resulted in his conviction.

> "Even the most competent counsel may from time-to-time make decisions or conduct himself in a manner which might be criticized by other equally competent counsel but that is not the measure of competency of counsel on review by an appellate court." (*People v. Wallin* (1981) 124 Cal.App.3d 479, 485.)

Prejudice must still be shown that creates a reasonable probability of a different result. Petitioner has failed to show that trial counsel's lack of investigation would have uncovered evidence that compellingly impeached the victim's credibility or should have altered his tactical decision to not attack the victim's credibility. Any additional evidence concerning Petitioner's living arrangements was either not useful or merely duplicated what had already been offered at trial. Finally, none of the evidence presented on habeas rehabilitated the damage to Petitioner's credibility at trial regarding his denial of problems with alcohol abuse.

1    As stated by our courts, "a defendant is entitled to a fair trial,
2  not a perfect one, and his counsel is not required to be infallible."
3  (*People v. Hartridge* (1955) 134 Cal.App.2d 659, 666-667, *citing United*
4  *States ex rel. Feeley v. Ragen* (7th Cir. 1948) 166 F.2d 976.)

5

6    Accordingly, based on the above analysis, the petition is
7  respectfully denied.

8

9

10  DATED: April 27, 2006

11                                              LINDA R. CONDRON
                                                JUDGE OF THE SUPERIOR COURT
12  cc:  Petitioner
         District Attorney
13       Research
         Sixth District
14       California Supreme Court

15

16

17

18

19

20

21

22

23

24

25

26

27

10

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

PEOPLE OF THE STATE OF CALIFORNIA )
                            Plaintiff,   )

Vs.                                 )

David Louis Costella           )

**CASE NO: CC246905**
Cal. Supreme Crt NO:S129092
Sixth District No.H025751

**FILED**

APR 2 7 2006

KIRI TORRE
Chief Executive Officer/Clerk
Superior Court of CA, County of Santa Clara
BY _____ DEPUTY

PROOF OF SERVICE BY MAIL OF: ORDER

CLERKS CERTIFICATE OF MAILING;

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF
THIS DOCUMENT WAS MAILED FIRST CLASS POSTAGE PREPAID IN A SEALED
ENVELOPE ADDRESSED AS SHOWN BELOW AND THE DOCUMENT WAS MAILED
AT SAN JOSE, CALIFORNIA ON April 27, 2006.

Dated: April 27, 2006

KIRRI TORRE
County Clerk

By: _Frances M Herbert_

Frances Herbert

Peter F. Goldscheider, Attorney at Law
433 Cambridge Avenue Suite 250
Palo Alto, Ca. 94306

Office of the District Attorney
70 W. Hedding Street
San Jose, Ca. 95110
Attn: Judith Sklar
(placed in inter-office box)

Research/Hall of Justice
190 W. Hedding Street
San Jose, Ca. 95110
(placed in inter-office box)

CJIC/Hall of Justice
190 W. Hedding Street
San Jose, Ca. 95110
(placed in inter-office box)

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## IN AND FOR THE COUNTY OF SANTA CLARA

**PEOPLE OF THE STATE OF CALIFORNIA** )
         Plaintiff, )
              )
  Vs.           )
              )
**David Louis Costella**     )
―――――――――――――――― )

**CASE NO: CC246905**
Cal. Supreme Crt NO:S129092
**Sixth District No H025751**

**FILED**

**APR 2 7 2006**
KIRRI TORRE
Chief Executive Officer/Clerk
Superior Court of the County of Santa Clara
BY _____ DEPUTY

PROOF OF SERVICE BY MAIL OF: ORDER

CLERKS CERTIFICATE OF MAILING;

I CERTIFY THAT I AM NOT A PARTY TO THIS CAUSE AND THAT A TRUE COPY OF THIS DOCUMENT WAS MAILED FIRST CLASS POSTAGE PREPAID IN A SEALED ENVELOPE ADDRESSED AS SHOWN BELOW AND THE DOCUMENT WAS MAILED AT SAN JOSE, CALIFORNIA ON April 27, 2006.

Dated: April 27, 2006

          KIRRI TORRE
          County Clerk

          By _____
            Frances Herbert

California Court of Appeals
Sixth District
333 W. Santa Clara Street Suite 1060
San Jose, Ca. 95113
Attn. Jane

California Supreme Court
350 McAllister Street
San Francisco, Ca. 94102-4783

# EXBIBIT B

year MTC

Jan SUNNYVALE

Feb SUNNYVALE

March SUNNYVALE

April SUNNYVALE

May SUNNYVALE

June SUNNYVALE

July SUNNYVALE

Dave
PARENTS

Aug NORMANDALE

Sept NORMANDALE OR.

Oct NORMANDALE

Nov NORMANDALE

Dec NORMANDALE

YEAR 17 1

Jan NORMANDALE

Feb NORMANDALE

March NORMANDALE

April NORMANDALE

May SPAFORE CT WILLOWGLEN

June

July

Aug

Sept

Oct

Nov

Dec ↓

year 1997

Tan    SPADAFORE CT. WILLOW GLEN
            ↓ VARIOUS DATES

Feb

March                          ↓

April .            JOSAPHINE KROTAL

May

June

July                    ↓

Aug .              MAE PETERSON

Sept               MAE PETERCON
                        MAGGIE  THIRD GRADE

                        MAE PETERSON

Oct                NADJA CHPOTAK
                        CHAPMAN → STARTED DATING

Nov                NADJA CHAPMAN

Dec    ↓ NADJA CHAPMAN

YEAR 1993

Jan    103 . HOOK LANE LOS GATOS
         NADJA CHADMAN - MOVED IN WITH

Feb

March

April

May

June   ↓ WILLOWDALE DRIVE

July        DATED NADJA CHADMAN
           OFF AND ON
                    DISABILITY
Aug         AUG 10TH KNEE SURGERY
           DIDNT SEE KIDS MUCH
           FOR SIX TO EIGHT WEEKS
Sept   MAGGIE 4TH
           GRADE

Oct

Nov

Dec    ↓    ↓ THRO DECEMBER

✓ BESIDES THE TIME I WAS ON DISABILITY,
  THE WEEKENDS I HAD THE KIDS (MOST OF THE TIME)
  WAS SPENT AT MY PARENTS BECAUSE I WAS WORKING
  WITH MY FATHER, AND MOM WOULD WATCH THE KIDS.
  JUNE THRO DECEMBER OF 93

YEAR 17.4

Jan    WRLOODDALE DR

WORKED PRAFTICLLY 7 DAYS A WEEK

Feb    SEVERA WEEKLENDS AT PARENTS
       WITH KIDS SO MOM COULD
March  BABY SIT.

April

May

June

July

Aug

Spet

       SHARON CRISTY

Oct

       SHARON CRISTY

Vou    SHARON CRISTY

Dec    SHARON CRISTY

YEAR  19 , 5

Jan     WILLOWDALE DR.
            SHARON CRISTY

Feb     SHARON CRISTY

March   SHARON CRISTY

April

May

June    JERALDINE

July

Aug

Spet

Oct

Nov

Dec

YEAR 1496

Jan          WILLOW DALE DR.

                    GERALDINE

Feb

March

April

May

June          SHERRIE

July          SHERRIE

Aug           GERALDINE

Spet

Oct

Nov

Dec

YEAR 1997

Jan      WKCOWDACE DR
              GERALDINE
                •

Feb

March

April

May        :

June

July

Aug

Spet

Oct

Nov

Dec    ↓    ↓

05/23/2002  07:55   6508529159                    MPP CCT QUALITY ENGR                    PAGE  09

YEHIR  1118

JAN   WILLOW DALE DR

          GERALONE

FEB

MARCH

APRIL

MAY

JUNE

JULY

AUG

SEPT

         MAGGIE STOPED COMING OVER FOR REGULAR
                 VISITS - BUT STILL CAME OVER

OCT   (MY CHOICE) FOR HOLIDAYS

NOV.

DEC

YEHIZ  1447

JAN            WILLOWDALE
               CERACDINE

FEB

MARCH

APRIL

MAY

JUNE

JULY

AUG

SEPT.      S HERRIE

OCT.

NOV.  GONTER WAY

DEC.      SHERRIE

          TO PRESANT

05/23/2002  07:55   6508529159                    MPP CCT QUALITY ENGR                    PAGE  11

YEAR   2000

JAN    GUNTER WAY

FEB

MARCH

APRIL

MAY

JUNE

JULY

AUG

SEPT

OCT.

NOV

DEC

YEAR  2001

JAN  GUNTER  WAY

FEB

MARCH

APRIL

MAY

JUNE

JULY

AUG

SEPT

OCT          CARD SUPPORT DOUBLED

NOV          MAGGIE WAS TOLD I COULD NOT AFORD COINGE TOTIOY
             DID NOT RECIVE BIRTHDAY CARD FROM US  OR
             GRAND PERENTS

DEC.         SAID SHE WAS COMING OVER FOR CHRISTMAS,
             DIDNT SHOW OP  SO THEREFOR SHE DIDNT
             RECIEV ANY CHRISTMAS PRESENTS

# EXBIBIT C

02/10/2004  13:51   4082461051
Sent By: HP LaserJet 3100;
6505299266
HJPM
0+;Feb-3-04  8:27;
PAGE  02/05
Page 2/5

Peter F. Goldscheider
State Bar Number 53617
438 Cambridge Avenue, Suite 250
Palo Alto CA 94301
(650) 323-8296


## IN THE COURT OF APPEAL FOR THE STATE OF CALIFORNIA

### SIXTH APPELLATE DISTRICT

|  |  |
|---|---|
| In re: | ) NO. |
|  | ) |
|  | ) Related No.  HO25751 |
|  | ) |
| DAVID LOUIS COSTELLA, | ) [Superior Court No. CC246905 |
|  | ) Santa Clara County] |
| On Habeas Corpus. | ) |

### DECLARATION OF ALBIE JACHIMOWICZ IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

I, Albie Jachimowicz hereby declare:

I am the attorney who represented the above named petitioner at trial. I am

attesting to this declaration at the request of his appellate attorney Peter F. Goldscheider.

With regard to my trial strategy in this case, it is true that Mr. Costella informed

me that in his opinion Maggie was deliberately lying about the molest allegations, in part

because of lingering resentments ~~possibly planted by his ex-wife and~~ for o-] kirkrt his refusal to pay

for her tuition and expenses at a four-year college. ~~He also indicated that her version of~~ We present evidence

through the testimony of witnesses attacking the complaining witnesses timeline of when the ostensible acts tooks place in relation to her living arrangements.

~~how and where the molests took place could be proven untrue by producing a timeline~~

~~through a series of witnesses indicating his living situation over the period from 1992 to~~

~~1995, when the molests allegedly~~ occurred. It was my belief, however, that a jury would

not be convinced that ~~Maggie was lying and a direct attack on her credibility would turn~~ *The sole reason for her accusations*

*was because of a failure to pay college tuition*

~~off the jury to our defense.~~ *& related costs.*

    I felt it would be more effective to argue that somehow she had convinced herself

that the molests occurred, possibly through her having taken psychotropic medications in

the years following 1995. This taken together with Mr. Costella's very convincing denial

of the allegations during the pretext calls constituted his best defense, in my opinion.

    ~~For this reason~~ I did not interview previous girlfriends ~~or other prospective~~

~~witnesses~~ on the issue of when and where Mr. Costella actually lived during the time

*previous girlfriends*

frame in questions. Nor did I feel it would be beneficial to interview ~~such witnesses~~ on

the issue of Maggie's credibility or propensity not to tell the truth.

*Corrected from file*    With regard to the defense I did pursue, I did not subpoena records of Maggie's *though I either reviewed or had*

therapists or physicians ~~in that I did not believe I could obtain those records based on the~~ *information regarding her primary physicans notes.*

~~current state of the law. I also did not investigate whether Maggie's statements at the~~ *I knew ~~she~~ had received counseling and mental*

*Based on* ~~preliminary hearing and to the police concerning where and from whom she had received~~ *health therapy for anorexia and related*

~~therapy and to whom she had spoken concerning the molestations were true, because I~~ *medical issues. I did not subpena her mental*

~~did not intend to attack her credibility.~~ *health professionals.*

    Prior to the commencement of having the jury hear the evidence, I tried to work

-2-

out the parameters of the "fresh complaint" evidence. The evidence actually admitted

was the best I believe that I could limit it to by securing court rulings on the subject.

With regard to the testimony that was given with regard to Maggie's eating disorder, I

did ~~not~~ consider moving to exclude it ~~and did not consult any expert consultants on the~~

*believed the evidence was both relevant and*

~~subject because it did not occur to me that we could keep it out of evidence. I felt the~~

*admissable. I did consult my expert, Dr. Brian Abbott*

~~same about the testimony of Mr. Costella's alcohol use.~~  *on this issue.*

*I did not move in limine to exclude reference to*

With regard to the reference in Mr. Costella's statement to the police that he

would be willing to take a lie detector test, I ~~did not~~ move to delete this reference, ~~or to~~

*not*

*I did attempt to*  ~~secure~~ a stipulation that he did in fact take (and pass) such a polygraph examination

because I felt that the inclusion of the reference might cause the jury to conclude that he

was innocent ~~because of his willingness to take such a test. I did not consider that they~~

~~may have reached the opposite conclusion (that he subsequently refused such a test or~~

~~failed to pass it).~~

*did not engage an*

Finally, I ~~completely failed to consider using~~ ∧ expert or lay opinion testimony to

establish the fact that Mr. Costella did not possess the personality characteristics of the

child molester and that he enjoyed a normal adult sexual life with a number of women

during the time he allegedly molested Maggie. As a result I did not interview various ex-

girlfriends ~~whom I am now informed could have have opined that in their opinion it was~~

*aware*

~~unlikely Mr. Costella committed the crimes charged.~~ I was ~~unaware~~ of case law that  *HOH?*

would have likely permitted such testimony. *as to the expert opinion.*

*Mr. Costellas use of alcohol because I*
*believed it to be relevant and admissable.*

-3-

Although I consulted with Dr. Alan Garton who produced a report that we utilized

for sentencing purposes, I also did not consider using him or another comparable expert

though

during trial ~~for the same reason that~~ I was ~~not~~ aware such testimony could be admissible

at trial.

I declare under penalty of perjury that the foregoing is true and correct as executed

in Corcoran, California.

   Dated:


             ————————————————

             **Albie Jachimowicz**

-4-